**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE BOLDT COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| and Counter-Defendant, | ) | |
| | ) | No. 19-cv-08383 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BLACK & VEATCH CONSTRUCTION, | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | |
| and Counter-Plaintiff. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant and Counter-Plaintiff Black & Veatch Construction, Inc. ("BVCI") served as the contractor for the construction of a 60-turbine wind farm in Good Hope, Illinois ("Project"). BVCI then subcontracted with Plaintiff and Counter-Defendant The Boldt Company ("Boldt") to offload and erect the wind turbines. About two months after work began, the Project was significantly behind schedule and not a single wind turbine had been fully erected. For that reason, BVCI terminated Boldt for cause. Boldt contends that BVCI wrongfully blamed Boldt for delaying the Project when BVCI and the Project's wind turbine vendor were actually to blame for the Project getting off schedule. Boldt therefore brought this lawsuit, alleging that BVCI breached its subcontract with Boldt when it terminated Boldt from the Project. In response, BVCI filed a counterclaim against Boldt for breach of contract. Now before the Court are BVCI's and Boldt's cross-motions for summary judgment. (Dkt. Nos. 124, 126.) For the reasons that follow, BVCI's motion is granted and Boldt's motion is denied.

## BACKGROUND

While Boldt and BVCI have numerous factual disputes relevant to their respective motions for summary judgment, the following facts establish the sequence of events giving rise to the present action and are undisputed unless otherwise noted.[1]

On February 8, 2019, BVCI, an engineering and construction company, entered into a contract ("Prime Contract") with Cardinal Point LLC ("Owner") under which BVCI agreed to serve as the engineering, procurement, and construction contractor in connection with the Project. (BVCI's Resp. to Boldt's Statement of Material Facts in Supp. of its Mot. for Summ. J. ("BVCI's RSOF") ¶ 1, Dkt. No. 154; Boldt's Resp. to BVCI's Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Boldt's RSOF") ¶¶ 1–2, Dkt. No. 160.) In addition, the Owner entered into a separate contract with General Electric Renewables North America, LLC ("GE") in which GE agreed to supply and deliver wind turbine parts to the site where the wind turbines would be built. (BVCI's RSOF ¶ 3; Boldt's RSOF ¶ 2.)

To erect the wind turbines, BVCI subcontracted with Boldt, a construction company that performs general contracting services in the power and utilities sector. (BVCI's RSOF ¶ 4; Boldt's RSOF ¶ 4.) Specifically, BVCI and Boldt's subcontract ("Subcontract") required, among other things, that Boldt offload the wind turbine parts delivered to the Project site by GE and

---

[1] Both BVCI and Boldt contend that their opponent has committed violations of the Northern District of Illinois's Local Rule 56.1, which governs summary judgment practice. Although each party, at times, identifies minor, technical violations of Local Rule 56.1, those violations pose no obstacle to the Court's ability to discern whether a fact is admitted or genuinely disputed. The Court therefore declines to strike any factual assertions on Local Rule 56.1 grounds. BVCI also filed a separate motion pursuant to Federal Rule of Evidence 408(a), which asks the Court to strike from Boldt's summary judgment submissions all references to what BVCI claims are its confidential settlement documents. (Dkt. No. 174.) The Court has determined that it can resolve the motions for summary judgment without reliance on the documents that BVCI seeks to strike and expresses no opinion on their admissibility. Instead, the Court denies BVCI's motion without prejudice to BVCI renewing any arguments concerning the challenged evidence's admissibility by way of a pretrial motion *in limine*, if necessary.

then erect the 60 wind turbines in accordance with the specified construction schedule. (*Id.*) Prior to beginning work on the Project, Boldt sub-subcontracted with TNT Crane & Rigging, Inc. ("TNT"),[2] a crane rental company, for the rental of cranes and to prepare lift plans for the Project's critical lifts (*i.e.*, lifts associated with the erection of the major components of each wind turbine).[3] (Boldt's RSOF ¶¶ 6, 32, 36, 45.) Pursuant to the Subcontract, Boldt remained liable for any failure of its sub-subcontractors in fulfilling Boldt's obligations under the Subcontract. (*Id.* ¶ 31.)

The Subcontract included a baseline construction schedule that was developed by Boldt ("Construction Schedule"). (BVCI's RSOF ¶ 8; Boldt's RSOF ¶ 19.) That schedule set out the planned sequence of construction activities using the critical path methodology.[4] (Boldt's RSOF ¶ 19.) The Subcontract specifically stated that "[p]erformance of the Work as scheduled in the Construction Schedule . . . is a material provision of the Subcontract." (*Id.* ¶ 20; *see also* BVCI's Statement of Material Facts in Supp. of Mot. for Summ. J., Ex. B, Subcontract § 00552.5.1, Dkt. No. 128-3.) Further, the Subcontract set construction milestone dates under which the first 10 wind turbines were scheduled for completion by August 31, 2019 and guaranteed by September 27, 2019. (Boldt's RSOF ¶ 22.) For erection of all 60 wind turbines, the Subcontract set November 5, 2019 as the planned completion date and November 8, 2019 as the guaranteed completion date. (*Id.*)

---

[2] Boldt filed a third-party complaint in this action asserting claims against TNT (Dkt. No. 19), but it ultimately voluntarily dismissed those claims. (Dkt. No. 114.)

[3] BVCI explains that "[a] lift plan is a detailed plan identifying how Boldt personnel will execute lifts of turbine component parts during the offloading and erection activities. Lift plans include key information necessary to safely perform a lift." (Boldt's RSOF ¶ 42.)

[4] The critical path methodology refers to a technique commonly used to develop a schedule for complex construction projects.

Boldt began work on erecting the wind turbines in early August 2019. (*Id.* ¶¶ 22, 47, 50.) Under the Construction Schedule, Boldt gave itself until August 16, 2019 to complete work on erecting the first wind turbine. (*Id.* ¶ 48.) However, Boldt almost immediately encountered difficulties in its work on the Project. First, under the Subcontract, Boldt could not perform any critical lifts without first preparing a lift plan, having that plan stamped by a professional engineer, and submitting the lift plan to BVCI at least 24 hours prior to the critical lift. (*Id.* ¶¶ 43–44.) Yet Boldt was unable to begin critical lifts for the first wind turbines as scheduled because TNT had failed to timely prepare adequate lift plans. (*Id.* ¶¶ 54, 67.) By August 21, 2019, Boldt had replaced TNT with a new sub-subcontractor tasked with preparing lift plans. (*Id.* ¶¶ 32, 54.) It was not until August 23, 2019, that Boldt submitted the first lift plans that BVCI could approve. (*Id.* ¶ 67.) Further, the cranes necessary to perform the erection work were not delivered to the Project and set up in accordance with the Construction Schedule. (*Id.* ¶¶ 85–86.) One crane that was necessary to "top out" (*i.e.*, install the final components) certain of the first ten turbines was not assembled until September 7, 2019, even though the Construction Schedule called for that crane's first lifts to begin on August 12, 2019. (*Id.* ¶¶ 87, 90, 92.)

During this time, Boldt's work was delayed by conditions that it contends were outside of its control, such as unsuitable soil conditions at the Project site and issues with the crane pads[5] designed and installed by BVCI. (Boldt's RSOF ¶¶ 8, 67, 88; BVCI's Resp. to Boldt's Statement of Additional Facts ("BVCI's RSAF") ¶ 2, Dkt. No. 167.) Most prominently, Boldt claims that its work was significantly affected by delays in the delivery of turbine parts attributable to the Project's turbine vendor, GE. (*See generally* BVCI's RSOF ¶¶ 16–21; Boldt's RSOF ¶ 27.) On

---

[5] "A 'crane pad' is a temporary structure that sits under a crane when it is performing a lift, and typically consists of compacted soil and other materials such as composite mats, gravel, and/or timber mats." (Boldt's RSOF ¶ 9.)

August 27, 2019, the Owner provided BVCI with a revised turbine delivery schedule that reduced the pace of GE's turbine-part deliveries from the original schedule set forth in the Owner's agreement with GE. (BVCI's RSOF ¶¶ 18–19.) BVCI, in turn, notified Boldt on August 30, 2019, of a "Turbine Vendor-Caused Delay" and directed Boldt to provide by September 6 "an estimated impact on Boldt's scope of work as well as an updated schedule and execution plan to minimize impact to the [P]roject which clearly indicates the recovery plan for the change in deliveries." (*Id.* ¶¶ 20–21 (internal quotation marks omitted); *see also* Exs. to Boldt's Statement of Material Facts in Supp. of Mot. for Summ. J. ("Exs. to Boldt's SOF"), Ex. 7, Dkt. No. 141-4.) Pursuant to its Prime Contract, BVCI notified the Owner of a Turbine-Vendor Caused Delay on September 4, 2019 due to "GE's failure to provide the Turbines in accordance with the Project Schedule," which BVCI explained "***may*** impact its ability to achieve certain schedule milestones." (BVCI's RSOF ¶¶ 26–27 (emphasis added) (internal quotation marks omitted).) The next day, BVCI sent the Owner a second notice of Turbine-Vendor Caused Delay, which explained that GE's delivery of incomplete turbine units could potentially cause a delay to the Project's schedule. (*Id.* ¶ 30.)

In mid-August, BVCI first raised concerns to Boldt regarding its failure to adhere to the Construction Schedule. (Boldt's RSOF ¶¶ 95–96.) Nonetheless, by the beginning of September, Boldt had not yet fully erected a single turbine, even though it had planned to have the first 10 turbines fully installed by the end of August. (*Id.* ¶¶ 22–23, 100, 108, 117.) Thus, on September 3, 2019, BVCI issued Boldt a "Notice of Default—Failure to Meet Schedule Obligations." (BVCI's RSOF ¶¶ 23–24; Boldt's RSOF ¶¶ 102–03.) Specifically, BVCI declared that Boldt was in default for failing to meet the baseline Construction Schedule as required by the Subcontract

and instructed Boldt to provide a recovery plan to recover the Construction Schedule. (BVCI's RSOF ¶ 24; Boldt's RSOF ¶ 103; Exs. to Boldt's SOF, Ex. 10, Dkt. No. 141-4.)

Two days later, in response to BVCI's notice of default, Boldt acknowledged that the Construction Schedule had been "significantly delayed and the Work impacted extensively" but denied responsibility for the delay. (Exs. to Boldt's SOF, Ex. 6, Dkt. No. 141-4; *see also* BVCI's RSOF ¶¶ 31–32; Boldt's RSOF ¶ 104.) Boldt also stated that it was "ready and willing to exhaust all schedule acceleration options" but asserted that "all acceleration costs [would] be the sole responsibility of BVCI." (BVCI's RSOF ¶ 33.) That is because Boldt believed that the delay was the result of reductions to GE's scheduled delivery of turbine parts, soil conditions that prevented deliveries of turbine parts to the Project site, and crane pad issues within BVCI's responsibility. (Exs. to Boldt's SOF, Ex. 6; BVCI's RSOF ¶ 32; Boldt's RSOF ¶ 104.) The next day, Boldt suspended its offloading and erection due to "unsafe conditions relative to crane pad preparation." (Boldt's RSOF ¶ 104 (internal quotation marks omitted).)

On September 7, 2019, BVCI issued to Boldt a "Notice of Continued Default of Subcontract Obligations" that responded to Boldt's response to the first notice of default. (BVCI's RSOF ¶ 34; Boldt's RSOF ¶ 105.) In that notice, BVCI claimed, among other things, that Boldt was rejecting its obligation to cure its schedule default and refused to issue a recovery plan as directed. (BVCI's RSOF ¶ 34.) Accordingly, BVCI informed Boldt that it "had no choice but to exercise all remedies necessary to protect and avoid further impacts to the [P]roject . . . including potential descoping or termination of all or part of Boldt's work for cause." (Exs. to Boldt's SOF, Ex. 14, Dkt. No. 141-4; *see also* BVCI's RSOF ¶ 34; Boldt's RSOF ¶ 105; Boldt's Resp. to BVCI's Statement of Additional Facts ("Boldt's RSAF") ¶ 21,

Dkt. No. 172.) BVCI also stated that it "reserved all rights under the Subcontract . . . as a result of Boldt's defaults." (Exs. to Boldt's SOF, Ex. 14; *see also* Boldt's RSOF ¶ 105.)

Following BVCI's issuance of the two notices of default, BVCI and Boldt executives and key personnel held multiple of meetings in mid-September devoted to getting the Project back on schedule. (*See generally* BVCI's RSOF ¶¶ 36–51; Boldt's RSAF ¶ 18.) Beginning September 11, 2019, BVCI took over Boldt's offloading responsibilities to allow Boldt to focus solely on erection work. (Boldt's RSAF ¶¶ 22–23.) Then, on September 20, BVCI descoped the erection work for 20 of the wind turbines, reducing Boldt's scope of erection work to 40 turbines. (BVCI's RSOF ¶¶ 51–52.) Nonetheless, Boldt experienced multiple incidents while performing its erection work on September 20 and 21, each of which caused damage to turbine parts. (Boldt's RSOF ¶¶ 108–111; Boldt's RSAF ¶¶ 27–28.) As a result of those incidents, BVCI directed Boldt to halt construction on September 23, 2019. (Boldt's RSOF ¶ 114, Boldt's RSAF ¶ 27.)

Boldt sent BVCI a letter on September 18, 2019, in which Boldt asserted that both GE and BVCI caused delays that together resulted in a 43-day impact to the Construction Schedule and that GE's delays had a cost impact to Boldt of over $1.8 million. (BVCI's RSAF ¶ 5.) To recover some of the delay to the Construction Schedule, Boldt proposed three acceleration options with the associated costs to be borne by BVCI. (BVCI's RSAF ¶ 5; Exs. to Boldt's SOF, Ex. 20, Dkt. No. 141-7.) On September 27, 2019, BVCI rejected Boldt's September 18 request for schedule relief and additional compensation in a letter titled "Notice of Boldt's Continued Default." (BVCI's RSOF ¶¶ 58, 60; Boldt's RSOF ¶ 115.) That letter also reiterated BVCI's contention that Boldt was in schedule default under the Subcontract and newly contended that the September 20 and 21 incidents that damaged turbine parts as a basis for default, explaining

that those "safety incidents raise a serious doubt on Boldt's ability to properly conduct the complicated lifting operations inherent to th[e] Project." (Exs. to Boldt's SOF, Ex. 29, Dkt. No. 141-7; BVCI's RSOF ¶ 62; Boldt's RSOF ¶ 115.) Finally, the letter informed Boldt that "due to Boldt's continued default and unwillingness to cure such defaults at its own expense," BVCI had taken over all Boldt's remaining work with respect to 20 specified turbines, effective September 20, 2019. (Exs. to Boldt's SOF, Ex. 29.)

On September 30, 2019, BVCI sent Boldt notice that Boldt's remaining work on the Project was terminated for cause pursuant to the Subcontract. (BVCI's RSOF ¶ 64; Boldt's RSOF ¶ 116; Boldt's RSAF ¶ 34.) At the time of termination, Boldt had yet to fully erect a single wind turbine. (Boldt's RSOF ¶ 117.) Subsequently, Boldt assumed responsibility for the completion of the turbine-erection work. (BVCI's RSAF ¶ 9.)

Claiming that it was wrongfully terminated from the Project, Boldt filed the present lawsuit against BVCI for breach of the Subcontract.[6] (Dkt. No. 1.) Along with its answer to Boldt's complaint, BVCI asserted a counterclaim alleging that Boldt breached the Subcontract by failing to complete its work on the Project in a timely and safe manner. (Dkt. No. 12.) BVCI has filed a motion for summary judgment on the claims asserted in Boldt's complaint while Boldt seeks summary judgment on BVCI's counterclaim.

---

[6] Boldt's complaint also asserted a quantum meruit claim. In its motion for summary judgment, BVCI argues that Boldt cannot recover under a quantum meruit theory because the parties' relationship was governed by an express contract, namely, the Subcontract. *E.g.*, *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 798–99 (N.D. Ill. 2010) ("[A] claim sounding in quantum meruit cannot be pursued where the parties are alleged to have entered into an express contract."). In its response to BVCI's motion for summary judgment, Boldt has agreed to withdraw its quantum meruit claim so long as the Court finds that the Subcontract was an enforceable agreement. (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 1 n.4, Dkt. No. 152.) There is no dispute between the parties that the Subcontract is an enforceable agreement and nothing in the record gives this Court reason to doubt the Subcontract's enforceability. For that reason, the Court considers Boldt's quantum meruit claim to be voluntarily dismissed.

## DISCUSSION

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, Boldt and BVCI each seek summary judgment on their opponent's breach of contract claim. In evaluating cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

The parties agree that Illinois law governs their breach of contract claims. (*See* Subcontract § 00552.29.1.) In Illinois, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Thus, "[a] court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* Only where the contract's language is "susceptible to more than one meaning," and thus ambiguous, may a court "consider extrinsic evidence to ascertain the parties' intent." *Id.*

Ultimately, the parties' dispute boils down to whether BVCI properly terminated Boldt pursuant to the Subcontract's "Termination for Cause" provision. Boldt alleges that BVCI lacked cause to terminate Boldt and therefore it is entitled to damages. On the other hand, BVCI claims that it properly terminated Boldt for cause and seeks to recover its costs for completing Boldt's work.

## I.      Boldt's Breach-of-Contract Claim

The Court turns first to BVCI's motion for summary judgment on Boldt's claim. Although Boldt acknowledges that there were significant delays to the Project's Construction Schedule, it nonetheless denies that it was responsible for those delays. Instead, Boldt contends that it could not have adhered to the Construction due to the failures of both BVCI and the Project's turbine vendor, GE. And it further asserts that, under the terms of the Subcontract, BVCI could not find Boldt in default of the Construction Schedule for delays that were caused by BVCI and GE or to which they contributed. Consequently, Boldt argues that BVCI breached the Subcontract by terminating Boldt for cause.

Boldt's complaint alleges multiple material breaches of the Subcontract committed by BVCI. Specifically, Boldt claims that BVCI breached the Subcontract by:

a.    Failing to provide and maintain crane pads and access roads adequate to support the offloading cranes, the heavy erection cranes, and the tower components.

b.    Permitting tower foundations to be backfilled in lifts that were too thick and did not achieve proper bearing capacity thereby weakening those portions of the crane pads that were constructed on such improperly backfilled soils.

c.    Failing to properly remediate the soft soils at crane pads using Prudent Wind Energy Industry Practices of undercutting soft soils and replacing them with engineered fill so that the crane pads could withstand the elements for the duration of their intended use.

d.    Demanding that Boldt perform offloading and tower erection operations despite the insufficiently prepared crane pads and contrary to Prudent Wind Energy Industry Practices.

e.    Refusing to extend the project schedule and compensate Boldt for costs incurred as the result of the following excusable and compensable delays:

  i.    Late and disorganized component deliveries.

  ii.   Stand-downs and inefficiencies due to improperly prepared crane pads and access roads.

iii.     BVCI's insistence on using composite crane pads to overcome known soft and wet soil conditions where such composite crane pads failed to overcome those conditions.

f.     Wrongfully and without factual basis blaming Boldt for the [P]roject delays caused by BVCI's own failures.

g.     Wrongfully and without factual basis terminating Boldt's work.

(Compl. ¶ 49, Dkt. No. 1.) In its motion for summary judgment, BVCI argues that all of the alleged grounds for the breach of contract claim fail as a matter of law. First, it contends that the breaches relating to issues with crane pads, access roads, and site laydown areas (*id.* ¶ 49(a)–(d), (e)(ii)–(iii), (f)) are barred by exculpatory clauses in the Subcontract. Second, BVCI asserts that Boldt's failure to provide sufficient notice of a Turbine Vendor-Caused Delay precludes it from recovering for any breach predicated on GE's delayed and incomplete deliveries of turbine parts (*id.* ¶ 49(e)(i)). And third, BVCI argues that Boldt materially breached the Subcontract by failing to timely and safely perform its work on the Project, thereby barring Boldt from claiming that it was wrongfully terminated in breach of the Subcontract (*id.* ¶ 49(g)). The Court addresses each of BVCI's contentions in turn.

### A.     Subcontract Exculpatory Clauses

Boldt alleges that its work on the Project was delayed, in part, due to BVCI's breach of its obligations under the Subcontract to provide suitable crane pads, access roads, and site laydown areas. While BVCI concedes that the Subcontract made it responsible for supplying the Project's crane pads, access roads, and site laydown areas, it nonetheless contends that two exculpatory clauses in the Subcontract bar Boldt's breach of contract claims related to the sufficiency of those BVCI-furnished "Construction Works."

The Subcontract provides that "[t]he Parties agree to furnish the Construction Works in accordance with Article 00654.2." (Subcontract § 00554.11; Boldt's RSOF ¶ 12.) "Construction

Works" is defined in the Subcontract to "mean[] everything used in the performance of work that is not intended to become a permanent part of the Project." (Subcontract § 00552.1; Boldt's RSOF ¶ 14.) There is no genuine dispute that crane pads, access roads, and site laydown areas were each temporary and therefore properly deemed Construction Works. (Boldt's RSOF ¶ 14.) And Section 00654.2 expressly assigns BVCI responsibility for providing crane pads, access roads, and site laydown areas. (Subcontract § 00654.2; Boldt's RSOF ¶¶ 11, 13.)

Two provisions in the Subcontract afford BVCI certain protections against liability with respect to those Construction Works it furnishes to Boldt. First, Section 00554.11.1 of the Subcontract provides:

> [BVCI] will schedule use and custody of [BVCI]-furnished Construction Works to optimize their service to the Project. [Boldt] agrees not to make unreasonable demands on [BVCI]-furnished Construction Works. [BVCI] does not guarantee uninterrupted use of [BVCI]-furnished Construction Works and [Boldt] has no Claim against [BVCI] for inconvenience suffered due to interruption in availability.

(Subcontract § 00554.11.1; Boldt's RSOF ¶ 12.) Second, Section 00554.11.3 states:

> If [Boldt] uses [BVCI]-furnished Construction Works, [BVCI] accepts those Construction Works "as is" and waives any Claims arising out of or relating to the use of those Construction Works.

(Subcontract § 00554.11.3; Boldt's RSOF ¶ 12.) The "Claims" that these exculpatory clauses protect BVCI against include "claims, actions, suits, liabilities, demands, damages, losses, costs, expenses (including reasonable attorneys' fees), impacts to price, impacts to schedule, awards, fines and judgments, of every kind and nature." (Subcontract § 00552.1; Boldt's RSOF ¶ 15.)

According to BVCI, the exculpatory clauses at Sections 00554.11.1 and 00554.11.3 plainly bar Boldt's breach of contract claims predicated on Boldt's use of BVCI-furnished crane pads, access roads, and site laydown areas. Notably, Boldt does not point to any record evidence that demonstrates that its relevant breach of contract claims are not "Claim[s] for inconvenience

suffered due to interruption in availability" of BVCI-furnished Construction Works or "Claims arising out of or relating to the use of those Construction Works." Instead, Boldt argues that the Subcontract contains more specific provisions outlining BVCI's obligations with respect to crane pads, access roads, and site laydown areas that control over the more general language of the exculpatory clauses. Specifically, under Section 00552.32.9 of the Subcontract:

> If, upon arrival of any of the [wind turbine] erection equipment at the Jobsite, [Boldt] reasonably determines, based upon the site conditions, that the Jobsite infrastructure conditions, including the roads, crane paths, or crane pads are unsafe or inaccessible, either for personnel or the components, for travel and access of the erection equipment for the Work, [BVCI] will provide a Subcontract Revision which may include appropriate adjustments to the Construction Schedule and Subcontract Price.

(Subcontract § 00552.32.9; BVCI's RSAF ¶ 1.) Further, Section 01100.1.3 requires that BVCI supply crane pads meeting the following specifications:

> Crane pads (level to 1%) adjacent to [wind turbine] foundations sufficient in size to allow facilitation of [Boldt's] lifting plan. Crane pads will be temporary and consist of compacted material that can support the crane load over an area of 50 feet by 80 feet, constructed in time to support [Boldt's] erection schedule and maintained throughout its need. A crane pad will be provided that will be sufficient for the design loads shown in [Boldt's] lift plan.

(Subcontract § 01100.1.3; BVCI's RSAF ¶ 1.) And Section 00554.4.6 makes clear that BVCI "is responsible for the Jobsite access roads, crane paths, and crossings for each" and also requires that BVCI "provide and maintain those to allow [Boldt] safe and adequate access to the [wind turbine] installation locations." (Subcontract § 00554.4.6; BVCI's RSAF ¶ 1.)

Boldt contends that BVCI's interpretation of the Subcontract's exculpatory clauses is unnatural and unreasonable, as it would render illusory the Subcontract's provisions setting forth detailed requirements for the BVCI-supplied crane pads, access roads, and site laydown areas. In Illinois, "[i]t is well-settled that when a contract contains both general and specific provisions relating to the same subject, the specific provision controls." *Dolezal v. Plastic & Reconstructive*

*Surgery, S.C.*, 640 N.E.2d 1359, 1366 (Ill. App. Ct. 1994). However, resort to this rule of construction is for when "an ambiguity exists in a contract due to a conflict between two of its provisions." *Bank of Com. v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016) (quoting *Countryman v. Indus. Comm'n*, 686 N.E.2d 61, 64 (Ill. App. Ct. 1997)). Even then, application of the rule "does not mean that the general language is knocked out of the contract, never to be seen again. Instead, we interpret the general provision in light of the specific provision." *Id.* Indeed, "[i]n interpreting a contract, it is presumed that all provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Shorr Paper Prods., Inc. v. Aurora Elevator, Inc.*, 555 N.E.2d 735, 737 (Ill. App. Ct. 1990).

Certainly, some conflict exists between the exculpatory clauses for BVCI-furnished Construction Works and the more specific provisions governing BVCI's obligations with respect to crane pads, access roads, and site laydown areas. For example, it is difficult to reconcile Boldt's agreement to accept BVCI-furnished Construction Works "as is" with BVCI's commitments to provide crane pads that meet certain specifications and to maintain access roads to allow safe access to the wind turbine installation locations. At the same time, it is not necessarily the case that the more specific Subcontract provisions entirely displace the exculpatory clauses with respect to crane pads, access roads, and site laydown areas. Rather, "effect should be given to the clause which is more specific, and the general clause should be subjected to such modification or qualification ***as the specific clause makes necessary***." *Lima Lake Drainage Dist. of Adams Cnty. v. Hunt Drainage Dist. of Hancock Cnty.*, 561 N.E.2d 1351, 1354 (Ill. App. Ct. 1990) (emphasis added).

Here, the provision stating that Boldt accepts BVCI-furnished Construction Works "as is" is properly subjected to qualifications necessitated by the specifications set forth elsewhere in the Subcontract, when applied to crane pads, access roads, and site laydown areas. That means the crane pads, access roads, and site laydown areas provided by BVCI must meet certain minimum standards, but once Boldt begins using them, it waives any "Claims" arising out of or relating to the use of those Construction Works. *See, e.g., Aeroground, Inc. v. CenterPoint Props. Tr.*, 738 F.3d 810, 816 (7th Cir. 2013) ("[W]here one provision is general enough to include the specific situation to which the other is confined, the specific provision will be deemed to qualify the more general one, that is, to state an exception to it." (internal quotation marks omitted)). Moreover, the extent of the waiver of "Claims" due to interruption in availability or related to the use of crane pads, access roads, and site laydown areas must be understood in the context of the remedies provided in the Subcontract for a Purchaser-Caused (*i.e.*, BVCI-Caused[7]) Delay. *See, e.g., Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016) ("We must construe the contract as a whole, viewing each part in light of the others." (internal quotation marks omitted)). Specifically, the Subcontract defines an "Owner and/or Purchaser-Caused Delay" as:

> [A] delay in the critical path of [Boldt's] or a Sub-subcontractor's performance of the Work or an increase in [Boldt's] or a Sub-subcontractor's costs that has been demonstrably caused by the failure of Owner, [BVCI], or other Owner and/or [BVCI] subcontractors (other than Turbine Vendor) or utility to perform any material obligation of (i) [BVCI] under this Subcontract (other than by exercise of rights under this Subcontract, including the exercise by [BVCI] of the right to have defective or nonconforming Work corrected or re-executed) or (ii) by the acts or omissions of Owner, [BVCI], other Owner and/or [BVCI] subcontractors (other than Turbine Vendor) or utility. Any portion of a delay that is substantially due to [Boldt's] or any of its Sub-subcontractors' actions or inactions shall not be an Owner and/or Purchaser-Caused Delay.

---

[7] As used in the Subcontract, "Purchaser" refers to BVCI. Generally, when quoting the Subcontract, the Court substitutes "Purchaser" with "BVCI."

(Subcontract § 00552.1; BVCI's RSOF ¶ 6.)

In alleging that BVCI breached the Subcontract and delayed the Construction Schedule by failing to provide crane pads, access roads, and site laydown areas as required by Subcontract Sections 00552.32.9, 01100.1.3, and 00554.4.6, Boldt is plainly alleging an "Owner and/or Purchaser-Caused Delay" based on BVCI's failures to perform material obligations under the Subcontract. In such circumstances, the Subcontract sets forth the procedures with which Boldt must comply. First, Boldt must promptly give notice as follows:

> [I]f [Boldt] believes an Owner and/or Purchaser-Caused Delay has occurred, then [Boldt] shall give [BVCI] written or electronic notice describing the alleged Owner and/or Purchaser-Caused Delay within three (3) days following the date on which Subcontractor became aware of the occurrence of an event [Boldt] believes is or may be an Owner and/or Purchaser-Caused Delay and [Boldt's] notice shall describe the details of the Owner and/or Purchaser-Caused Delay and any effects on [Boldt's] performance of its obligations under this Subcontract.

(Subcontract § 00552.34.2.) Once Boldt provides notice of an Owner and/or Purchaser-Caused Delay, "it will be entitled to a Subcontract Revision the extent so provided in Article 00552.19."

(Subcontract § 00552.34.4.) And, relevant here, Section 00552.19.6 provides:

> Subject to Articles 00552.34 and 00552.35, if an Owner and/or Purchaser-Caused Delay or Turbine Vendor-Cause Delay occurs that directly results in an actual, substantiated delay in [Boldt's] achievement of a milestone, or if the Subcontract otherwise entitles [Boldt] to a Subcontract Revision, Subcontractor may request a Subcontract Revision allowing an extension of the schedule, to the extent of the actual, substantiated delay in achieving the milestone, an extension to any other affected time requirements and to an adjustment in the Subcontract Price to cover any actual, substantiated impact in [Boldt's] performance as a result thereof.

(Subcontract § 00552.19.6.)

Viewed as a whole, the Subcontract sets forth a detailed scheme for Boldt to follow when it believes that its work has been delayed due to BVCI's failure to meet its obligations under the Subcontract. By requiring notice within three days of the event that Boldt believes constitutes a

BVCI-caused delay, the Subcontract demonstrates the parties' intent that the any such delays be promptly brought to BVCI's attention during the course of Boldt's work. Further, the prescribed remedy for an ***actual and substantiated*** BVCI-caused delay is a Subcontract Revision that may extend the schedule and adjust the Subcontract price, as necessary. That is confirmed by the language of one of the more specific provisions cited by Boldt, which expressly states that where Boldt believes that the crane pads or access roads are unsafe and inaccessible, BVCI shall provide it with a Subcontract Revision, which may include schedule and price adjustments. (Subcontract § 00552.32.9; BVCI's RSAF ¶ 1.)[8]

Given that the "Claims" from which BVCI is exculpated include impacts to price and impacts to schedule, the exculpatory clauses must be qualified insofar as they would otherwise preclude Boldt from seeking a Subcontract Revision for a BVCI-caused delay, as authorized by the Subcontract. Such an interpretation ensures that Boldt has recourse where BVCI fails to supply crane pads, access roads, and site laydown areas in accordance with the minimum standards set by the Subcontract. Yet nothing in the language of the more specific provisions relied upon by Boldt compels any further qualification of the exculpatory clauses. On the contrary, to find that the exculpatory clauses have no effect whatsoever with respect to the crane pads, access roads, and site laydown areas would contravene the contractually expressed intent of having any BVCI-caused delays promptly addressed during the course of Boldt's work and resolved by means of an extension to the Construction Schedule or the Subcontract's price. Put

---

[8] Although Section 00552.32.9 provides that BVCI ***shall*** provide a Subcontract Revision in the event that Boldt determines that the crane pads or access roads are unsafe or inaccessible, the Court does not read that language as excusing Boldt from complying with the Owner and/or Purchaser Caused Delay procedures and actually requesting a Subcontract Revision in such circumstances. (*See* Subcontract § 00552.19.6 ("[I]f the Subcontract otherwise entitles [Boldt] to a Subcontract Revision, [Boldt] ***may*** request a Subcontract Revision.") (emphasis added).)

differently, the exculpatory clauses in this context are best read as precluding Boldt from eschewing the procedures and remedies set forth for an Owner and/or Purchaser-Caused Delay and instead initiating a lawsuit based on the alleged BVCI-caused delays months after the delay-causing events. That interpretation properly harmonizes the more general language of the exculpatory clauses applicable to BVCI-furnished Construction Works and BVCI's specific obligations with respect to the crane pads, access roads, and site laydown areas.

Again, in opposing summary judgment on its breach of contract claims concerning the BVCI-furnished crane pads, access roads, and site laydown areas, Boldt does not argue that the exculpatory clauses are inapplicable as a factual matter. Nor does Boldt claim that it timely pursued the Subcontract's procedures and remedies for an Owner and/or Purchaser-Caused Delay. Its sole contention is that the exculpatory clauses cannot be interpreted to apply in any manner where the implicated BVCI-furnished Construction Works involve crane pads, access roads, or site laydown areas. The Court does not agree. Instead, the Court finds that the exculpatory clauses continue to protect BVCI from liability in the circumstances here—where Boldt seeks to litigate the suitability of the BVCI-furnished crane pads, access roads, and site laydown areas for the first time in court and following its termination from the Project. Consequently, BVCI is entitled to summary judgment on Boldt's breach of contract claims related to the crane pads, access roads, and site laydown areas.

## B.     Turbine-Vendor Caused Delays

There is no dispute that the Project's turbine vendor, GE, experienced issues delivering turbine parts as originally scheduled in its turbine-supply agreement with the Owner. Boldt contends that the Subcontract protects it against liability for delays caused by GE's failure to perform its obligations under its agreement with the Owner. Accordingly, Boldt asserts that

BVCI breached the Subcontract by terminating Boldt for cause based on Construction Schedule delays that were the fault of GE.

The Subcontract defines "Turbine Vendor-Caused Delay" to mean, in relevant part:

> [A] delay in [Boldt's] or a Sub-subcontractor's performance of the Work or an increase in [Boldt's] or a Sub-subcontractor's costs that has been demonstrably caused by: (a) the failure of Turbine Vendor personnel to perform its obligations in accordance with the Turbine Supply Agreement (Attachment E-14 under Article 1100.2.1.) [or] (b) the failure of Turbine Vendor personnel to provide the Turbines in accordance with the Construction Schedule included in Article 01100.2.1 Attachment C . . .; provided that if a failure of the Turbine Vendor . . . as described above is caused by or attributable to [Boldt's] or Sub-subcontractor's breach of this Subcontract, then to the extent such delay is caused by such failure, it shall not be deemed to be a Turbine Vendor-Caused Delay.

(Subcontract § 00552.1; BVCI's RSOF ¶ 6.) Section 00552.35.2 then sets out the following procedures for providing notice of a Turbine Vendor-Delay:

> Notwithstanding anything to the contrary under this Subcontract, if [Boldt] believes an event constituting a Turbine Vendor-Caused Delay has occurred, [Boldt] shall give [BVCI] written or electronic notice describing the alleged Turbine Vendor-Caused Delay within five (5) days following the date on which [Boldt] became aware of the occurrence of such event. Within twenty (20) days after the date a Turbine Vendor-Caused Delay has actually caused a demonstrable delay or increase in cost in [Boldt's] performance of the Work, [Boldt] shall give [BVCI] written notice describing the details of Turbine Vendor-Caused Delay and any effects on [Boldt's] performance of its obligations under this Subcontract.

(Subcontract § 00552.35.2; Boldt's RSAF ¶ 5.) Then, Section 00552.35.3 affords Boldt certain protections against liability or responsibility for a Turbine Vendor-Caused Delay:

> So long as the conditions set forth in this Article 00552.35 are satisfied, [Boldt] shall not be responsible or liable for or deemed in breach of the Subcontract because of any failure or delay in completing the Work in accordance with the schedule or achieving any milestone to the extent that such failure has been caused by one or more Turbine Vendor-Caused Delays, provided that: (i) such suspension of performance and extension of time shall be of no greater scope and of no longer duration than is required by the effects of Turbine Vendor-Caused Delay; (ii) [Boldt] provides timely notice of Turbine Vendor-Caused Delay, and (iii) [Boldt] provides all assistance reasonably requested by [BVCI], at [BVCI's] cost, for the elimination or mitigation of Turbine Vendor-Caused Delay.

19

(Subcontract § 00552.35.3, BVCI's RSOF ¶ 6.) And Section 00552.35.4 authorizes Boldt to seek

a Subcontract Revision in the event of a Turbine Vendor-Caused Delay:

> If [Boldt] desires a Subcontract Revision for a Turbine Vendor-Caused Delay, [Boldt] shall comply with the notice requirements contained in Article 00552.35.2. If [Boldt] does so, it shall be entitled to a Subcontract Revision to the extent so provided in Article 00552.19. If [Boldt] fails to comply with such notice requirements, [Boldt] will be deemed to have waived its right to receive a Subcontract Revision as a result of the subject Turbine Vendor-Caused Delay.

(Subcontract § 00552.35.4; BVCI's RSAF ¶ 1.)

While BVCI acknowledges that Boldt, on several occasions, gave 5-day notice of an

event that it believed constituted a Turbine Vendor-Caused Delay pursuant to Section

00552.35.2, BVCI denies that Boldt ever provided a single 20-day notice of an actual Turbine

Vendor-Caused Delay. BVCI asserts that Boldt's adherence to Section 00552.35.2's notice

procedures was a condition precedent to obtaining schedule or price relief for a Turbine Vendor-

Caused Delay. And because Boldt failed to provide sufficient notice, BVCI argues that Boldt

cannot maintain its breach of contract claim predicated on BVCI's alleged refusal to extend the

Construction Schedule and Subcontract price due to GE's late and disorganized turbine

deliveries. On the other hand, Boldt argues that Section 00552.35.3, not section 00552.35.2,

governs its notice obligations. And even if Section 00552.35.2 governs, Boldt contends that it

gave notice that met both the 5-day and 20-day notice requirements.

Both parties agree that proper notice was a condition precedent to Boldt's obtaining relief

for a Turbine Vendor-Caused Delay. *See, e.g.*, *Assocs. Asset Mgmt., LLC v. Cruz*, 144 N.E.3d

169, 176 (Ill. App. Ct. 2019) (explaining that where a note made notice a condition precedent to

default and acceleration, "strict compliance with those conditions is required"). Thus, the Court

begins by determining the form of notice Boldt was required to provide. Boldt believes that the

5-day and 20-day notice requirements set out in Section 00552.35.2 apply only where Boldt

intends to seek a Subcontract Revision as a result of a Turbine Vendor-Caused Delay. For support, it points to Section 00552.35.4, which expressly states that Boldt must "comply with the notice requirements contained in Article 00552.35.2" to obtain a Subcontract Revision. (Subcontract § 00552.35.4; BVCI's RVCI's RSAF ¶ 1.) By contrast, Boldt argues that Section 00552.35.3 governs the circumstances here—*i.e.*, where Boldt seeks to avoid being held liable for a breach of Subcontract for a failure or delay in completing work on the Project that was caused by GE. And Section 00552.35.3 requires only that Boldt "provide[] timely notice of Turbine Vendor-Caused Delay." (Subcontract § 00552.35.3; BVCI's RSOF ¶ 6.) In Boldt's view, Section 00552.35.3's general requirement of "timely notice" is a freestanding notice requirement distinguishable from Section 00552.35.2's notice provisions; if Section 00552.35.3 were intended to require notice pursuant to Section 00552.35.2, it would have expressly incorporated Section 00552.35.2's notice requirements as in Section 00552.35.4.

While Section 00552.35.3's requirement of "timely notice of Turbine Vendor-Caused Delay" is not a model of clarity, the Court nonetheless concludes that Section 00552.35.3 cannot reasonably be interpreted as not requiring notice in accordance with Section 00552.35.2. The biggest problem with Boldt's proposed interpretation is that it ignores Section 00552.35.3's opening clause, which states: "So long as the conditions set forth in this Article 00552.35 are satisfied." (Subcontract § 00552.35.4; BVCI's RVCI's RSAF ¶ 1.) The notice requirements in Section 00552.35.2 are the only conditions set forth in Article 00552.35.[9] Further, Section 00552.35.2's language requires the 5-day and 20-day notices of a Turbine Vendor-Caused Delay

---

[9] The language of Section 00552.35.3's opening clause also indicates that notice pursuant to Section 00552.35.2 operates as a condition precedent. *See, e.g., AAR Int'l, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002) ("Conditions precedent are generally indicated by the terms 'on the condition,' 'subject to,' 'when,' 'as soon as,' or other similar terms.").

Case: 1:19-cv-08383 Document #: 190 Filed: 03/30/23 Page 22 of 36 PageID #:9998

"[n]otwithstanding anything to the contrary under this Subcontract." (Subcontract § 00552.35.2; Boldt's RSAF ¶ 5.) And Section 00552.35.3's protections apply only so long as Boldt's "suspension of performance and extension of time shall be of no greater scope and of no longer duration *than is required by the effects of the Turbine Vendor-Caused Delay*." (Subcontract § 00552.35.3, BVCI's RSOF ¶ 6 (emphasis added).) That strongly suggests that Boldt must supply BVCI with the 20-day notice because that is the notice by which Boldt advises BVCI of the effects of the Turbine Vendor-Caused Delay on Boldt's performance of its obligations. Consequently, reading Section 00552.35.3 in context with the rest of Article 00552.35, leaves no doubt that its protections are conditioned on Boldt satisfying Section 00552.35.2's 5-day and 20-day notice requirements.

Having found Section 00552.35.2 applicable, the Court next considers whether Boldt provided the requisite 5-day and 20-day notices of Turbine Vendor-Caused Delay. Boldt contends that there can be no doubt that it provided sufficient notice and points to 18 notices of impact that it sent between August 16, 2019 and September 14, 2019. (Boldt's Opp'n to BVCI's Mot. for Summ. J., App. A, Dkt. No. 152-1; BVCI's RSAF ¶ 2; Boldt's Statement of Additional Facts, Ex. 2, Notices of Impact, Dkt. No. 159-2.) BVCI does not dispute that those notices of impact meet the criteria of a 5-day notice under Section 00552.35.2. However, the notices fall well short of providing the level of detail regarding the Turbine Vendor-Caused Delay and its effects that is required for a 20-day notice. Indeed, each notice states that "[a]t this time the full cost and schedule impacts may not be known" and Boldt "reserves the right to quantify and claim additional compensation and schedule days at a later date." (Notices of Impact.) Thus, the notices, by their own terms, do not show that a Turbine Vendor-Caused Delay had "actually caused a demonstrable delay or increase in cost in [Boldt's] performance of the Work," nor do

22

they describe how the event affected Boldt's performance of its obligations under the Subcontract. (Subcontract § 00552.35.2; Boldt's RSAF ¶ 5.)

Boldt also suggests that it was not required to provide BVCI with a 20-day notice of a Turbine Vendor-Caused Delay because, by August 27, 2019, BVCI already was fully aware of GE's inability to make deliveries as scheduled. On that date, BVCI received a reduced GE delivery schedule from Owner, and BVCI, in turn, advised Boldt of a Turbine Vendor-Caused Delay.[10] (BVCI's RSOF ¶¶ 18–21.) As an initial matter, it is questionable whether BVCI's notice to Boldt of a Turbine Vendor-Caused Delay can excuse Boldt from complying with its obligations under Section 00552.35.2, as that section states that Boldt "***shall*** give [BVCI] written notice." (Subcontract § 00552.35.2; Boldt's RSAF ¶ 5 (emphasis added).) Even accepting Boldt's position that BVCI's recognition of a Turbine Vendor-Caused Delay suffices, GE's reduced delivery schedule was just a single event meeting the criteria of a Turbine Vendor-Caused Delay. Boldt improperly conflates the Turbine Vendor-Caused Delay affecting future turbine-part deliveries with other, already existing delays that it asserts were attributable to GE.

By the time BVCI learned of GE's reduced delivery schedule, Boldt's work was already well behind the Construction Schedule. For example, Boldt received and offloaded the parts for one of the first turbines scheduled for erection, T71, by August 9, 2019, which was in sufficient time to fully install the turbine by August 22, 2019, as planned. (Boldt's RSOF ¶¶ 63, 66–67, 75.) Nonetheless, Boldt did not begin erecting T71 until August 28, 2019. (*Id.* ¶¶ 71–72.) The delays in work on T71 predated and could not have been caused by GE's reduced delivery

---

[10] Boldt draws the Court's attention to the fact that after advising Boldt of a Turbine Vendor-Caused Delay, BVCI "set up new accounting codes and scope change folders to track Boldt's claims related to the Turbine Vendor-Caused Delay." (BVCI's RSOF ¶ 22.) It is perhaps telling, however, that Boldt points to no evidence that any claims were ever filed in those folders.

schedule. Moreover, it was the delays to erection work on the initial set of turbines that BVCI cited in its first notice of default as its basis for finding Boldt in schedule default. (Boldt's RSOF ¶ 103; Exs. to Boldt's SOF, Ex. 10.) Notice provisions generally serve the purpose of "ensur[ing] that the party ***is informed*** and the notice was delivered." *Rogers v. Balsley*, 608 N.E.2d 1288, 1292 (Ill. App. Ct. 1993) (emphasis added). But a notice of a Turbine Vendor-Caused Delay affecting forthcoming turbine-part deliveries does nothing to inform BVCI as to how GE caused Boldt's delays in assembling those turbines that GE had completely delivered.

Although Boldt contends that its early work was affected by issues with GE's turbine-part deliveries (*see, e.g.*, Boldt's RSOF ¶¶ 46, 53, 67), it must be able to point to a written 20-day notice for the particular conduct that affected its work. Section 00552.35.2 required Boldt to give notice each time it "believes an event constituting a Turbine Vendor-Caused Delay has occurred," and then again after the event "has actually caused a demonstrable delay or increase in cost," along with a description of "the details of Turbine Vendor-Caused Delay and any effects on [Boldt's] performance of its obligations under this Subcontract." (Subcontract § 00552.35.2; Boldt's RSAF ¶ 5.) The evident purpose of the notice provision was to ensure that BVCI was contemporaneously apprised of each individual event constituting a Turbine Vendor-Caused Delay and how each event affected Boldt's performance. Such notice would then allow BVCI to address and resolve the issue promptly during the course of work, while minimizing the delay to the work. That purpose is reinforced by the fact that Section 00552.35.3 extends its protections only as required by the effects of the delay and only so long as Boldt provides all assistance necessary "for the elimination or mitigation" of the delay. (Subcontract § 00552.35.3, BVCI's RSOF ¶ 6.) Moreover, proper notice entitles Boldt to an adjustment to the Construction Schedule or Subcontract price in the form of a Subcontract Revision. (Subcontract

§§ 00552.19.3, 00552.35.4; BVCI's RSAF ¶ 1.) A proper 20-day notice should therefore connect a specific act or omission on the part of GE with a concrete delay or increase in cost to Boldt, and should provide details as to the effects of that Turbine Vendor-Caused Delay on Boldt's ability to perform as scheduled.

None of the evidence on which Boldt relies to prove 20-day notice sufficiently describes a Turbine Vendor-Caused Delay that prevented Boldt from erecting any of the wind turbines that were scheduled to be completed by the end of August 2019. BVCI first expressed its concerns regarding Boldt's delays in erecting the first ten turbines on August 14, 2019, when it provided Boldt with a letter that would serve as a notice of Subcontractor-Caused Delay. (Boldt's RSOF ¶¶ 95–96.) Boldt's response to that letter vaguely referred to "multiple delivery delays which has direct implications on demurrage costs and extended work hours" (Exs. to Boldt's RSOF, Ex. 70, Dkt. No. 162-17; Boldt's RSOF ¶ 96), but lacks the detail of a 20-day notice and also fails to suggest that those delays affected its erection work rather than just its offloading work. In its response to BVCI's first notice of default, Boldt referred generally to how "[t]he GE delivery sequencing has been inconsistent which has created crew flow issues" without actually identifying a specific Turbine Vendor-Caused Delay or explaining how any delay prevented it from timely erecting any particular wind turbine. (BVCI's RSOF ¶ 32.)

In mid-September, BVCI and Boldt held meetings regarding the delays afflicting the Project. Boldt points to notes from one of those meetings as proof that it brought all the purported Turbine Vendor-Caused Delays to BVCI's attention. But notes recording Boldt's oral contentions regarding supposed GE-caused delays are unlikely to constitute the form of "written notice" envisioned by Section 00552.35.2. In any case, the notes again speak at a high level, stating in relevant part that "GE is not providing ordered deliveries as presented in the contract.

GE is not delivering 2 complete [wind turbine] sites before starting delivery at a 3rd site."
(BVCI's RSOF ¶ 37.) The notes do not describe any particular Turbine Vendor-Caused Delay,
nor do they specify the effects of GE's deficient performance. Presumably Boldt elaborated on
GE's issues in greater detail during its meetings with Boldt, but nothing in the record establishes
that BVCI actually received notice of any one Turbine Vendor-Caused Delay that prevented
Boldt from timely erecting a particular wind turbine.

Finally, on September 18, 2019, Boldt sent BVCI an email that attached a document
listing pending commercial items and three proposals for accelerating its work. (*Id.* ¶ 43.)
Section 1.1 of that document described GE's delivery impacts as follows:

> The Boldt work has been impacted by GE delivery delays. The impacts of these
> delivery delays have increased the overall project costs in a few areas. The first and
> most obvious additional cost incurred is extended wait time for the unloading crew.
> The second additional cost incurred is a result of deliveries being made out of
> sequence which has required additional mobilizations of crews and equipment to
> work sites. The third additional cost is being incurred as a result of the revised
> delivery schedule for the project. The original delivery schedule was based on ten
> complete turbines each week. It's also most noteworthy that the revised delivery
> schedule will delay the overall project and will restrict schedule acceleration
> options. In total there will be 19 days that are unrecoverable to the project schedule
> as a result of the revised delivery schedule. This 19-day schedule extension has a
> cost impact to the Boldt general conditions for staffing, equipment, and
> subcontractors.

(Exs. to Boldt's SOF, Ex. 20.) The document also provides GE's claimed cost and schedule
impacts. (*Id.*) But while this document contains the most detailed written explanation of Boldt's
contentions regarding GE, it still does not meet the criteria of a 20-day notice.

As an initial matter, a written notice from September 18, 2019 is unlikely to be timely
with respect to most potential Turbine Vendor-Caused Delays affecting turbine erection work
scheduled for August 2019. Substantively, the document again fails to provide specifics as to any
alleged Turbine Vendor-Caused Delay other than GE's reduced schedule. And while the second

26

item again raises issues with GE's deliveries, Boldt actually states that those issues caused a "Schedule Impact" of "0" days.[11] (*Id.*) Thus, by Boldt's own account, it cannot trace its inability to timely erect the initial wind turbines to GE.

To claim Section 00552.35.3's protections from liability for delays traceable to GE, Boldt had to provide BVCI with timely notice of a Turbine Vendor-Caused Delay. And timely notice requires a 20-day notice describing the specific Turbine Vendor-Caused Delay and detailing how it delayed Boldt's performance. Boldt fails to show that it provided a 20-day notice, and therefore it cannot maintain a breach of contract claim alleging that it was wrongfully denied schedule relief for a Turbine Vendor-Caused Delay.

### C.  Prior Material Breaches

For the remainder of its breach of contract claim, Boldt contends that BVCI lacked a factual basis for terminating its work on the Project. BVCI asserts as an affirmative defense to this claim that Boldt committed at least two prior material breaches of the Subcontract that defeat its claim: Boldt's schedule default and its failure to safely perform the work.

In Illinois, generally "a contractual party's material breach excuses the other side's performance." *Brenner v. Greenberg*, No. 08 C 826, 2011 WL 862224, at *1 (N.D. Ill. Mar. 10, 2011); *see also Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 95 (Ill. 2006) ("Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations."). According to BVCI, Boldt was in material breach of two provisions of the Subcontract. First, the Subcontract provides that "Performance of the Work as scheduled in the Construction Schedule . . . is a

---

[11] The first item relates solely to Boldt's offloading work, and even then, Boldt claims that it had a zero-day schedule impact. (Exs. to Boldt's SOF, Ex. 20.) And since the third item concerns GE's reduced delivery schedule, it cannot explain the delays that pre-dated the revised schedule.

*material* provision of the Subcontract." (Subcontract § 00552.5.1; Boldt's RSOF ¶ 20 (emphasis added).) Second, the Subcontract requires that Boldt "shall conduct all operations under this Subcontract in a manner that minimizes the risk of bodily harm and damage to property" and states that Boldt's failure to comply with certain specific safety requirements "constitutes a *material breach* of this Subcontract." (Subcontract § 00554.3.1; Boldt's RSOF ¶ 24 (emphasis added).)

Normally, "the materiality of a contract breach is a question of fact reserved for the jury," but the issue can be decided as a matter of law where no reasonable factfinder could find a breach was not material. *Brenner v. Greenberg*, No. 08 C 826, 2010 WL 4719694, at *7 (N.D. Ill. Nov. 15, 2010). Here, there is no jury question as to materiality, as the Subcontract expressly identifies Boldt's obligations to perform its work safely and in accordance with the Construction Schedule as material terms. *See, e.g.*, *In re Krueger*, 192 F.3d 733, 742 (7th Cir. 1999) ("Parties to a contract may make timely performance a material element of the contract."). Nor does Boldt deny the materiality of those terms; it only denies that it breached those obligations.

As to Boldt's alleged failure to perform its work safely, the Court observes that there remain questions of fact as to whether the supposed safety incidents cited by BVCI in fact breached Boldt's safety obligations under the Subcontract. (Boldt's RSOF ¶¶ 108–111.) By contrast, the parties agree Boldt's work was well behind the Construction Schedule. (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 13, Dkt. No. 152 ("[T]he parties agree that the project was delayed as compared to the baseline Construction Schedule at the time Boldt was terminated.").) The question is whether Boldt was responsible for the delay.

It is undisputed and documented in the record that, during August 2019, Boldt was not keeping pace on critical tasks within its own realm of responsibility—namely, the preparation of

lift plans and crane setup. (Boldt's RSOF ¶¶ 53–58, 67–74, 76–78, 80, 82–94; *see also* Boldt's Opp'n to BVCI's Mot. for Summ. J. at 13 n.13 ("Boldt agrees conceptually with a substantial portion of BVCI's asserted facts related to delayed lift plans and an untimely top-out crane).) For example, in the case of the T71 turbine discussed above, the first critical lift was scheduled to begin on August 13, 2019, but Boldt did not submit the necessary lift plans until August 28, 2019. (*Id.* ¶¶ 62, 67, 71.) Nonetheless, Boldt contends that there were multiple contributing factors to the delays—namely, GE's performance issues and BVCI's failures with respect to the crane pads, access roads, and site laydown areas. And Boldt claims that the delays attributable to GE and BVCI were the true cause of an irrecoverable delay to the Construction Schedule.

Had Boldt followed the procedures for giving notice of and obtaining relief for Owner and/or Purchaser-Caused Delays and for Turbine Vendor-Caused Delays,[12] there would have been a contemporaneous record describing the delay event and cataloguing its impacts. In turn, BVCI could have investigated the delay event's impacts in real time, assessed who was responsible for the alleged delay, and granted Boldt a Subcontract Revision if necessary. Of course, Boldt failed to create such a record and, instead, now proposes to litigate the true cause of the Project delays, years after the fact, by means of "a battle of forensic scheduling expert testimony." (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 14.)

Ultimately, the Subcontract prevents Boldt from revisiting the issue of whether it was truly responsible for delaying the Project. As discussed above, the Subcontract's exculpatory clauses and Boldt's failure to provide sufficient notice of a Turbine Vendor-Caused Delay

---

[12] Boldt contends that certain of the issues related to the access roads and site laydown areas were a result of unexpectedly soft soils caused by record precipitation in the area. Thus, the soft soils may have been caused by a Force Majeure Event, in which case the Subcontract also proscribed the procedures for providing notice and obtaining relief for associated delays. (Subcontract §§ 0552.33.1–0552.33.4; Boldt's RSAF ¶ 3.)

prevent Boldt from now trying to assign blame to BVCI and GE. That leaves Boldt solely responsible for the schedule default and therefore in material breach of the Subcontract. As a result, Boldt cannot maintain its wrongful termination breach-of-contract claim. And because Boldt cannot maintain any portion of its breach of contract claim, BVCI's motion for summary judgment is granted.

## II.     BVCI's Breach of Contract Counterclaim

Despite the Court's conclusion that BVCI properly determined that Boldt was in schedule default, Boldt contends that it is nonetheless entitled to summary judgment on BVCI's breach of contract counterclaim because BVCI failed to comply with the notice and cure requirements set forth in the Subcontract's termination-for-cause provision.[13] Alternatively, even if Boldt was in schedule default, it argues that BVCI's claim for damages still fails as a matter of law.

### A.     Notice and Opportunity to Cure

Boldt argues that BVCI's counterclaim fails because BVCI did not satisfy a condition precedent to termination for cause. In particular, the Subcontract's "Termination for Cause" provision states:

> If [Boldt] defaults in any obligation under this Subcontract and does not cure the default within seven (7) calendar days after receipt of [BVCI's] written notice identifying the default, or if the default cannot be cured within this seven (7) day period, if [Boldt] does not commence action to cure the default and diligently pursue the cure to completion, [BVCI] may terminate all or part of the Work. If [BVCI] terminates all or part of the Work, [BVCI] will give [Boldt] written notice of termination specifying the extent to which the Work is terminated.

---

[13] Boldt also contends that it is entitled to summary judgment on BVCI's counterclaim because of the Turbine Vendor-Caused Delay. The Court's ruling above disposes of that contention.

(Subcontract § 00552.23.1; BVCI's RSOF ¶ 6.) According to Boldt, BVCI failed to provide Boldt the contractually required seven days to cure its default because it sent notice of default on September 27, 2019 and then terminated Boldt only three days later.

As Boldt acknowledges, the September 27 notice of default was actually titled "Notice of Boldt's Continued Default" and was BVCI's third notice to Boldt. BVCI initially provided Boldt with a "Notice of Default—Failure to Meet Schedule Obligations" on September 3, 2019 and then followed up with a "Notice of Continued Default of Subcontract Obligations" on September 7, 2019. Nonetheless, Boldt contends that there are two independent reasons why its September 30 termination cannot be justified by the September 3 and September 7 notices of default.

First, Boldt claims that subsequent to its September 7 notice, BVCI modified the Construction Schedule when it relieved Boldt of its offloading responsibilities on September 11, 2019, and then again on September 20, 2019, when it descoped 20 wind turbines from Boldt's erection scope of work. Boldt asserts that those reductions to its work served to either cure or otherwise eliminate its default, since Boldt could not be in default of a baseline Construction Schedule that was no longer applicable at the time of its termination.

The Court disagrees that BVCI's decision to take over part of Boldt's work ameliorated Boldt's default. Under the Subcontract:

> [I]f [Boldt] does not bring its performance into compliance with the schedule requirements of this Subcontract, [BVCI] may direct [Boldt] to accelerate the Work by whatever means [BVCI] deems necessary (including acceleration of the Work by means of overtime, additional crews, additional shifts, additional equipment and/or re-sequencing of the Work) in order to recover and maintain the Work as scheduled under this Subcontract.

(Subcontract § 00552.5.2.) BVCI's direction that Boldt limit its work to erecting 40 wind turbines is consistent with this authorization.[14] Moreover, the Construction Schedule is part of the Subcontract, and Boldt cannot show that it was changed by means prescribed by the Subcontract, such as a Subcontract Revision. (*See* Subcontract § 00552.19.3 ("No change is effective without a Subcontract Revision or Work Authorization issued by [BVCI].").)

Second, Boldt claims that its schedule default was cured on September 27, 2019 because, on that date, the Owner granted BVCI a schedule extension pursuant to the Prime Contract. (BVCI's RSOF ¶¶ 54–55.) However, Boldt cannot point to any provision in the Subcontract governing its relationship with BVCI that would allow it to piggyback on a schedule extension granted to BVCI under its separate contract with Owner. Nor does Boldt contend that it is a third-party beneficiary under the Prime Contract. (*See* Boldt's RSAF ¶ 29.) The revisions to the Prime Contract had no impact on Boldt's obligations under the Subcontract.

Boldt essentially asks the Court to find that its originally noticed default had been cured or obviated through the efforts of others. Not only is that contention unsupported by the language of the Subcontract's termination-for-cause provision, but it also suggests that the Court need not consider whether Boldt itself took any steps that would suggest that it could get its work back on track. And Boldt's performance after receiving notice of default gave BVCI reason to believe that it could not. Three days after receiving the first notice of default, Boldt suspended all offloading and erection activities, claiming unsafe conditions with respect to the crane pad preparation. (Boldt's RSOF ¶ 104.) Meanwhile, new difficulties arose with respect to Boldt's

---

[14] The Court disagrees with Boldt's contention that the parenthetical listing examples of ways Boldt might accelerate its work prevents Boldt from taking over work as a means of acceleration. The "by whatever means necessary" language is broad, and the parenthetical examples do not suggest that reducing Boldt's work is an impermissible acceleration option.

erection work on turbines that were scheduled to be completed by the end of August (and remained within its narrowed scope of work). On September 20, 2019, Boldt worked to top out two turbines that were among the first scheduled to be completed, but the lifts were unsuccessful and resulted in damage to the turbine parts. (*Id.* ¶¶ 60, 108–11.) Two additional damage incidents occurred in the following days, eventually resulting in BVCI directing Boldt to halt construction on September 23, 2019. (*Id.* ¶¶ 111, 114.) At no point prior to its termination did Boldt fully erect a single wind turbine, despite having over three weeks after its initial notice of termination to do so. (*Id.* ¶ 117.)

Accepting Boldt's contention that its default had been resolved by the time of the September 27 notice would unreasonably restrict BVCI from determining based on Boldt's post-notice work that Boldt would not be able to timely perform, even with a reduced workload and a schedule incorporating the extension that the Owner granted BVCI. Meanwhile, discussions had broken down between Boldt and BVCI about getting the Project back on track, as Boldt insisted that BVCI should bear the costs of acceleration. (BVCI's RSOF ¶¶ 33–34.) The Subcontract, however, states that Boldt "will be solely liable for costs to accelerate the Work for any delay caused by Subcontractor," whereas for delays beyond Boldt's control, it must give notice following the procedures for Force Majeure Events, Owner and/or Purchaser-Caused Delays, or Turbine Vendor-Caused Delays. (Subcontract § 00552.5.2.) At best, Boldt gave notice of a Turbine Vendor-Caused Delay related to GE's reduced delivery schedule—as discussed above, that delay did not account for the noticed schedule default. Moreover, even as Boldt acknowledged an irrecoverable delay to the Construction Schedule and believed itself entitled to a change to the Subcontract price (BVCI's RSOF ¶¶ 44–45), it does not contend that it properly sought a Subcontract Revision, as would be necessary to effect such changes. (*See* Subcontract

§ 00552.19.3.) Thus, while Boldt has evidence that it presented options to accelerate its work (BVCI's RSOF ¶ 45), the record does not show that Boldt took any concrete steps in furtherance of that effort.

In short, the Court finds that the undisputed evidence shows that BVCI properly adhered to the procedures to effect a termination for cause under the Subcontract. It first gave notice of default on September 3, 2019, and then again on September 7, 2019. Yet, over the next two weeks, Boldt's pace of work showed no improvement (and arguably worsened), and therefore it remained in schedule default at all times until its September 30, 2019 termination. Consequently, the initial notice of default stayed operative and despite ample time to cure its default, Boldt failed to do so. Accordingly, the Court denies Boldt summary judgment as to BVCI's compliance with the termination-for-cause procedures.

### B. Damages

Boldt argues that even if BVCI's counterclaim survives, the Court should still enter summary judgment precluding BVCI from seeking more than nominal damages because BVCI is unable to provide a reasonable basis for computing its damages.

To prove breach of contract damages, "the burden is on the plaintiff to establish a reasonable basis for computing damages." *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 792 (Ill. App. Ct. 2008). "Thus, damages must be proved with reasonable certainty and cannot be based on conjecture or speculation." *Id.* Here, BVCI seeks through its counterclaim to recover the costs it incurred in completing the full scope of Boldt's work as originally contracted. However, Boldt argues that because BVCI descoped 20 wind turbines and offloading duties from Boldt's work prior to terminating it, BVCI is entitled only to the cost of completing 40 wind turbines. And because BVCI did not segregate the costs for those 40 wind turbines from the descoped work, it cannot prove damages.

34

As an initial matter, the Court observes that Boldt does not point to any provision of the Subcontract suggesting that BVCI cannot recover the costs for the descoped 40 wind turbines and offloading work. The term "descope" is not even used in the Subcontract. As discussed above, the descoping functioned as a means of accelerating Boldt's work and in such circumstance Boldt was "solely liable for costs to accelerate." (Subcontract § 00552.5.2.) Nor is there evidence of any agreement whereby BVCI assumed the costs for the descoped work. Boldt simply relies on its own document setting forth acceleration proposals in which Boldt states that it "will accept a deductive contract change in the amount of ($408,555) for the transfer of the unloading scope as BVCI has decided to make this scope transfer for convenience." (BVCI's RSOF ¶ 44; Boldt's RSAF ¶ 172.) Needless to say, this proposal from Boldt does not prove the existence of a binding agreement.

In any case, the Court rejects Boldt's primary contention that BVCI never terminated Boldt's offloading work and the 20 wind turbines for cause. To the contrary, the September 27 notice of continued default made clear that BVCI was partially terminating Boldt's work at least as to the 20 descoped wind turbines. Relevant here, that notice stated as follows:

> Due to Boldt's continued default and unwillingness to cure such defaults at its own expense, BVCI moved forward with plans to accelerate the work by taking over additional work as described below:
>
> - Effective September 20, 2019, BVCI assumed all of Boldt's remaining scope of Work at the following 20 sites: T42, T43, T35, T36, T37, T38, T39, T68, T45, T44, T40, T41, T34, T33, T32, T31, T30, T29, T28, T27.
>
> By September 30, 2019, BVCI requests Boldt provide copies of all agreements related to the ***terminated work*** to BVCI including but not limited to its sub-subcontract with the down-tower electrical subcontractor, any equipment rental agreements and any material purchase agreements such that BVCI may properly complete the work.

35

(Exs. to Boldt's SOF, Ex. 29 (emphasis added).) Although BVCI did not expressly identify its action as a "partial termination for cause," BVCI stated that it was taking over Boldt's work on the 20 listed wind turbines due to Boldt's failure to cure its continued default and requested copies of Boldt's agreements related to the terminated Work.[15] The language cannot be reasonably read as anything but a partial termination for cause. Then, in the September 30 notice of termination, BVCI informed Boldt that it was "terminat[ing] all of Boldt's *remaining* Work." (Exs. to Boldt's SOF, Ex. 30, Dkt. No. 141-7.) Together, the September 27 and September 30 notices leave no question that BVCI's entire scope of work was terminated for cause.

The Court finds that BVCI gave Boldt proper notice of default and an adequate opportunity to cure its default. Upon reasonably concluding that Boldt had not cured its default, BVCI terminated the entirety of Boldt's originally contracted work. Consequently, Boldt's motion for summary judgment on BVCI's counterclaim is denied.

## CONCLUSION

For the foregoing reasons, BVCI's motion for summary judgment on Counts I and II of Boldt's complaint (Dkt. No. 126) is granted and Boldt's motion for summary judgment on BVCI's counterclaim (Dkt. No. 124) is denied.

ENTERED:

Dated: March 30, 2023

_____
Andrea R. Wood
United States District Judge

---

[15] The Subcontract's termination provisions provide that, in the event of a termination, Boldt shall, upon request, "promptly give [BVCI] complete copies of agreements related to the terminated Work." (Subcontract § 00552.23.2.)