**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE BOLDT COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| and Counter-Defendant, | ) | |
| | ) | No. 19-cv-08383 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BLACK & VEATCH CONSTRUCTION, | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | |
| and Counter-Plaintiff. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant and Counter-Plaintiff Black & Veatch Construction, Inc. ("BVCI") served as the contractor for the construction of a 60-turbine wind farm in Good Hope, Illinois ("Project"). BVCI then subcontracted with Plaintiff and Counter-Defendant The Boldt Company ("Boldt") to offload and erect the Project's wind turbines. When the Project fell significantly behind schedule, BVCI terminated Boldt for cause. Boldt claimed that BVCI wrongfully blamed it for delaying the Project when BVCI and the Project's wind turbine vendor were actually to blame for the Project getting off schedule. Boldt therefore brought this lawsuit, alleging that BVCI breached its subcontract with Boldt when it terminated Boldt from the Project. In turn, BVCI filed a counterclaim against Boldt, also for breach of contract. Recently, the Court granted BVCI summary judgment as to Boldt's claim for because it found that there was no dispute of material fact that BVCI properly terminated Boldt for cause due to its schedule default. It also denied Boldt's motion for summary judgment as to BVCI's counterclaim. Now, Boldt moves for reconsideration of both rulings. (Dkt. Nos. 199, 201.) For the reasons that follow, both motions are denied.

**BACKGROUND**

A more detailed summary of the facts relevant to BVCI's motion for summary judgment may be found in the Court's memorandum opinion addressing BVCI and Boldt's respective motions for summary judgment. (Mar. 30, 2023 Mem. Op. and Order ("Summ. J. Ruling"), Dkt. No. 190.) The Court assumes familiarity with those facts.

To summarize briefly, in its complaint, Boldt alleges multiple breaches of BVCI and Boldt's subcontract ("Subcontract"). Broadly, Boldt's breach of contract claim asserts that BVCI wrongfully terminated Boldt from the Project for cause based on delays to the Subcontract's baseline construction schedule ("Construction Schedule") that were, in fact, attributable to both BVCI and the turbine vendor for the Project. According to Boldt, BVCI's failure to provide suitable crane pads, access roads, and site laydown areas consistent with its obligations under the Subcontract was one of the true contributing factors to a portion of the delay to the Construction Schedule. Boldt then blamed the turbine vendor's delayed and incomplete deliveries of turbine parts for the remainder of the delay. On the other hand, BVCI contended that Boldt was the sole cause of delay to the Project and therefore asserted a counterclaim alleging that Boldt was properly terminated for cause due to its failure to complete its work on the Project in a timely and safe manner. BVCI and Boldt each moved for summary judgment as to their opponent's claim.

In its motion, BVCI asserted three grounds that it claimed entitled it to summary judgment as to the entirety of Boldt's breach of contract claim. First, BVCI argued that Boldt's claims based on alleged breaches predicated on issues with the BVCI-supplied crane pads, access roads, and site laydown areas were barred by two exculpatory clauses in the Subcontract. Second, BVCI contended that Boldt could not recover for any breach related to the turbine vendor's delayed and incomplete deliveries of turbine parts because it failed to properly give

notice of a Turbine Vendor-Caused Delay as required by the Subcontract. Third, BVCI contended that Boldt's material breach of its obligations under the Subcontract to perform its work on the Project timely and safely precluded Boldt's claim that it was wrongfully terminated for cause. Ultimately, the Court found in favor of BVCI with respect to each of the three grounds and entered summary judgment for BVCI as to Boldt's breach of contract claim. At the same time, the Court denied summary judgment to Boldt on BVCI's counterclaim.

Following the Court's decision on the two motions for summary judgment, Boldt filed separate motions asking the Court to reconsider both its grant of summary judgment to BVCI on Boldt's claim and its denial of summary judgment to Boldt on BVCI's counterclaim. Together, Boldt's two motions span over 50 pages and challenge nearly every aspect of the Court's decision as to the two summary judgment motions. Given the length and scope of the combined motions and the limited circumstances in which motions for reconsideration are warranted, the Court instructed the parties to brief only issues relating to the Court's grant of summary judgment to BVCI based on the Subcontract's exculpatory clauses.

## DISCUSSION

Under Federal Rule of Civil Procedure 54(b), a district court may reconsider its interlocutory orders at any time before entry of a final judgment. Fed. R. Civ. P. 54(b); *e.g.*, *Wiegel v. Stork Craft Mfg., Inc.*, 891 F. Supp. 2d 941, 944 (N.D. Ill. 2012). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (internal quotation marks omitted). The Seventh Circuit has recognized that a motion for reconsideration "performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of*

3

*Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotation marks omitted).

As discussed above, Boldt's two motions for reconsideration challenge nearly every basis of the Court's decision on the two motions for summary judgment. It is well recognized, however, that issues warranting reconsideration "rarely arise and the motion to reconsider should be equally rare." *Id.* at 1191 (internal quotation marks omitted). Accordingly, a motion for reconsideration "is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale*, 90 F.3d at 1270. Indeed, a district court's decisions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Beezley v. Fenix Parts, Inc.*, No. 1:17-cv-7896, 2019 WL 666754, at *1 (N.D. Ill. Feb. 13, 2019) (internal quotation marks omitted).

For the most part, Boldt's motions for reconsideration assert arguments that either were made or could have been made in their summary judgment briefs. The Court informed Boldt that such arguments were not appropriate for a motion for reconsideration and it would not consider them. Nonetheless, Boldt did assert that the portion of the Court's decision granting summary judgment for BVCI based on the applicability of the Subcontract's exculpatory clauses went beyond the adversarial issues presented to the Court. If correct, that would provide a basis for revisiting the decision Consequently, the Court instructed the parties to focus their reconsideration briefing on that aspect of the Court's decision. Boldt's motion for reconsideration of the grant of summary judgment for BVCI is denied as to any other issues and its motion for reconsideration of the denial of summary judgment for Boldt is denied in full.

That leaves the Court to decide whether it properly granted BVCI summary judgment based on its finding that the Subcontract's exculpatory clauses barred Boldt's claims regarding the supposed insufficiency of the BVCI-supplied crane pads, access roads, and site laydown areas. In particular, the Court considers whether its ruling on that issue rested on grounds outside the adversarial issues presented to the Court. If so, the Court must consider whether Boldt has presented evidence showing that the Court's ruling on the applicability of the exculpatory clauses was erroneous.

## I.    Outside Adversarial Issues Presented to the Court

The moving party "ha[s] the initial burden of identifying the basis for seeking summary judgment." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). By contrast, "[t]he nonmovant is not required to present evidence on an issue not raised by the movant." *Id.* Generally, "if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006).

In its opening brief in support of summary judgment on Boldt's breach of contract claim, BVCI argued that two exculpatory clauses in the Subcontract barred Boldt's claim that it was wrongfully terminated from the Project due, in part, to delays that were attributable to BVCI's failure to provide crane pads, access roads, and site laydown areas consistent with its obligations under the Subcontract. Specifically, BVCI argued that the crane pads, access roads, and site laydown areas constituted Construction Works, as defined in the Subcontract, and those Construction Works were furnished by BVCI. The Subcontract contained two provisions providing BVCI with certain protections from liability with respect to the Construction Works it furnished to Boldt. First, Section 0554.11.1 of the Subcontract provided:

> [BVCI] will schedule use and custody of [BVCI]-furnished Construction Works to optimize their service to the Project. [Boldt] agrees not to make unreasonable demands on [BVCI]-furnished Construction Works. [BVCI] does not guarantee uninterrupted use of [BVCI]-furnished Construction Works and [Boldt] has no Claim against [BVCI] for inconvenience suffered due to interruption in availability.

(BVCI's Statement of Material Facts in Supp. of Mot. for Summ. J., Ex. B, Subcontract

§ 00554.11.1, Dkt. No. 128-3.) Second, Section 00554.11.3 states:

> If [Boldt] uses [BVCI]-furnished Construction Works, [BVCI] accepts those Construction Works "as is" and waives any Claims arising out of or relating to the use of those Construction Works.

(Subcontract § 00554.11.3.) The "Claims" against which those exculpatory clauses protected

BVCI included "claims, actions, suits, liabilities, demands, damages, losses, costs, expenses

(including reasonable attorneys' fees), impacts to price, impacts to schedule, awards, fines and

judgments, of every kind and nature." (Subcontract § 00552.1.)

BVCI argued that the Subcontract's two exculpatory clauses plainly protected it from

liability for all Claims related to the Construction Works it furnished to Boldt, including the

crane pads, access roads, and site laydown areas. In response, Boldt briefly argued that the

exculpatory clause in Section 00554.11.1 did not apply because its claims in this case are not

"for inconvenience suffered due to interruption in availability."[1] It did not, however, argue that

Section 00554.11.3 was not otherwise factually applicable. Rather, Boldt contended that the

general protections afforded to BVCI by Section 00554.11.3 were trumped by more specific

sections of the Subcontract concerning BVCI's obligations with respect to the crane pads, access

roads, and site laydown areas. First, under Section 00552.32.9 of the Subcontract:

> If, upon arrival of any of the [wind turbine] erection equipment at the Jobsite, [Boldt] reasonably determines, based upon the site conditions, that the Jobsite infrastructure conditions, including the roads, crane paths, or crane pads are unsafe

---

[1] As the Court observed in its decision, BVCI provided no evidentiary support for this argument. (Summ. J. Ruling at 12–13.)

or inaccessible, either for personnel or the components, for travel and access of the erection equipment for the Work, [BVCI] will provide a Subcontract Revision which may include appropriate adjustments to the Construction Schedule and Subcontract Price.

(Subcontract § 00552.32.9.) Further, Section 001100.1.3 required that BVCI supply crane pads meeting the following specifications:

Crane pads (level to 1%) adjacent to [wind turbine] foundations sufficient in size to allow facilitation of [Boldt's] lifting plan. Crane pads will be temporary and consist of compacted material that can support the crane load over an area of 50 feet by 80 feet, constructed in time to support [Boldt's] erection schedule and maintained throughout its need. A crane pad will be provided that will be sufficient for the design loads shown in [Boldt's] lift plan.

(Subcontract § 01100.1.3.) And Section 00554.4.6 made clear that BVCI "is responsible for the Jobsite access roads, crane paths, and crossings for each" and also required that BVCI "provide and maintain those to allow [Boldt] safe and adequate access to the [wind turbine] installation locations." (Subcontract § 00554.4.6.)

Given that the Subcontract set forth more detailed obligations as to the BVCI-supplied crane pads, access roads, and site laydown areas, Boldt contended that it would be unnatural and unreasonable to read the more general exculpatory clauses in a manner that rendered BVCI's obligations illusory. BVCI responded to that point in its reply brief by explaining that the Subcontract contained procedures for Boldt to obtain schedule relief in the event that its work was delayed due to the fault of BVCI. In particular, Boldt was required to follow the Subcontract's procedures for an Owner and/or Purchaser-Caused Delay.[2] The Subcontract defined an Owner and/or Purchaser-Caused Delay to mean:

[A] delay in the critical path of [Boldt's] or a Sub-subcontractor's performance of the Work or an increase in [Boldt's] or a Sub-subcontractor's costs that has been demonstrably caused by the failure of Owner, [BVCI], or other Owner and/or

---

[2] BVCI is referred to as the "Purchaser" in the Subcontract. Thus, when quoting the Subcontract, the Court will generally substitute "Purchaser" with "BVCI."

[BVCI] subcontractors (other than Turbine Vendor) or utility to perform any material obligation of (i) [BVCI] under this Subcontract (other than by exercise of rights under this Subcontract, including the exercise by [BVCI] of the right to have defective or nonconforming Work corrected or re-executed) or (ii) by the acts or omissions of Owner, [BVCI], other Owner and/or [BVCI] subcontractors (other than Turbine Vendor) or utility. Any portion of a delay that is substantially due to [Boldt's] or any of its Sub-subcontractors' actions or inactions shall not be an Owner and/or Purchaser-Caused Delay.

(Subcontract § 00552.1.)

Under the procedures for an Owner and/or Purchaser-Caused Delay, Boldt was first required to give notice as follows:

[I]f [Boldt] believes an Owner and/or Purchaser-Caused Delay has occurred, then [Boldt] shall give [BVCI] written or electronic notice describing the alleged Owner and/or Purchaser-Caused Delay within three (3) days following the date on which Subcontractor became aware of the occurrence of an event [Boldt] believes is or may be an Owner and/or Purchaser-Caused Delay and [Boldt's] notice shall describe the details of the Owner and/or Purchaser-Caused Delay and any effects on [Boldt's] performance of its obligations under this Subcontract.

(Subcontract § 00552.34.2.) Upon giving notice of an Owner and/or Purchaser-Caused Delay, Boldt would "be entitled to a Subcontract Revision the extent so provided in Article 00552.19."

(Subcontract § 00552.34.4.) Relevant here, Section 00552.19.6 provided:

Subject to Articles 00552.34 and 00552.35, if an Owner and/or Purchaser-Caused Delay or Turbine Vendor-Cause Delay occurs that directly results in an actual, substantiated delay in [Boldt's] achievement of a milestone, or if the Subcontract otherwise entitles [Boldt] to a Subcontract Revision, [Boldt] may request a Subcontract Revision allowing an extension of the schedule, to the extent of the actual, substantiated delay in achieving the milestone, an extension to any other affected time requirements and to an adjustment in the Subcontract Price to cover any actual, substantiated impact in [Boldt's] performance as a result thereof.

(Subcontract § 00552.19.6.) Finally, giving proper notice of an Owner and/or Purchaser-Caused Delay would afford Boldt the following protections from liability:

[S]o long as the conditions set forth in this Article 00552.34 are satisfied, [Boldt] shall not be responsible or liable for or deemed in breach of the Subcontract because of any failure or delay in completing the Work in accordance with the schedule or achieving any milestone to the extent that such failure has been caused by one or

more Owner and/or Purchaser-Caused Delays, provided that: (a) such suspension of performance and extension of time shall be of no greater scope and no longer duration than is required by the effects of the Owner and/or Purchaser-Caused Delay; (b) [Boldt] provides timely notice of the Owner and/or Purchaser-Caused Delay[;] and (c) [Boldt] provides all assistance reasonably requested by [BVCI], at [BVCI's] cost, for the elimination or mitigation of the Owner and/or Purchaser-Caused Delay.

(Subcontract § 00552.34.3.)

The Court ultimately agreed with BVCI that the more specific provisions regarding the BVCI-supplied crane pads, access roads, and site laydown areas did not deprive the exculpatory clauses of all effect as to those BVCI-furnished Construction Works. Instead, to the extent there was any conflict, the more specific provisions qualified the exculpatory clauses. Further, the Court explained that its interpretation was bolstered by the fact that the Owner and/or Purchaser-Caused Delay provisions set forth a detailed scheme for Boldt to follow when it believed that its work had been delayed due to BVCI's failure to meet its obligations under the Subcontract. Subject to Boldt's compliance with the notice requirements, that scheme protected Boldt from liability for an Owner and/or Purchaser-Caused Delay and also entitled Boldt to seek a schedule extension or price relief by way of a Subcontract Revision. Viewing the exculpatory clauses together with the Owner and/or Purchaser-Caused Delay provisions, the Court concluded that the Subcontract evidenced the parties' intent that any BVCI-caused delays promptly be brought to BVCI's attention during the course of Boldt's work and that any actual and substantiated delay be resolved by means of a Subcontract Revision. However, the exculpatory clauses would act to bar any other Claims related to delays associated with BVCI-furnished Construction Works not pursued through the Owner and/or Purchaser-Caused Delay mechanism.

It is at this point in the analysis that Boldt contends the Court strayed beyond the adversarial issues presented by the parties. Having determined that the exculpatory clauses were

applicable and did not obviate BVCI's obligations as to the crane pads, access roads, and site laydown areas, the Court went on to consider whether Boldt's claims concerning the BVCI-caused delays were nonetheless barred because Boldt did not timely pursue the Subcontract's remedies for an Owner and/or Purchaser-Caused Delay. As Boldt accurately notes, BVCI did not argue that Boldt failed to seek relief for an Owner and/or Purchaser-Caused Delay in its opening summary judgment brief. Thus, Boldt argues, it had no obligation to come forward with evidence that it timely sought such relief in its response brief. The Court is not so sure. *See Raab v. Wendel*, No. 16-CV-1396, 2019 WL 3001632, at *5 (E.D. Wis. July 10, 2019) (explaining that the district court did not improperly decide an issue not raised in the initial motion for summary judgment when it granted summary judgment on the same basis asserted by the movant, "albeit a modestly different iteration of the legal theory raised" by the movant); *BP Amoco Chem. v. Flint Hills Res., LLC*, 489 F. Supp. 2d 853, 857 (N.D. Ill. 2007) ("[W]ere the Court solely restricted to the arguments of counsel and the research provided, there would be many uninformed and just plain incorrect decisions rendered. Rather, the Court must be free to research the law and apply logical extensions of arguments made by counsel." (internal quotation marks omitted)).

Ultimately, the issue raised by BVCI's summary judgment motion was whether the exculpatory clauses barred Boldt's claims related to the BVCI-supplied crane pads, access roads, and site laydown areas. To defeat summary judgment on that issue, Boldt was "required to wheel out all its artillery to defeat it." *Caisse Nationale*, 90 F.3d at 1270 (internal quotation marks omitted). As the Court noted, in claiming that BVCI failed to supply suitable crane pads, access roads, and site laydown areas as required by the Subcontract, Boldt was plainly alleging an Owner and/or Purchaser-Caused Delay. That Boldt had availed itself of the procedures for obtaining relief for an Owner and/or Purchaser-Caused Delay was one potential argument it

could have raised in opposition to summary judgment, as it speaks to the issue of whether the exculpatory clauses were factually applicable to Boldt's specific claims. Given the extensive argument regarding the Turbine Vendor-Caused Delay provisions (which were substantially similar to the Owner and/or Purchaser-Caused Delay provisions) made in connection with both motions for summary judgment, the Court expected that Boldt would have rolled out the weapon of Owner and/or Purchaser-Caused Delay if it were in its artillery. Instead, Boldt relied solely on the legal argument that the more specific provisions in Subcontract Sections 00552.32.9, 01100.1.3, and 00554.4.6 defeated the exculpatory clauses. *See, e.g.*, *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 4111426, at *2 (N.D. Ill. July 7, 2015) ("A motion for reconsideration does not allow a party to revisit strategic decisions that prove to be improvident, to reargue the evidence, to make new arguments, or to introduce new evidence that could have been presented earlier." (internal quotation marks omitted)).

Elsewhere in its motion for summary judgment, BVCI argued that even if the exculpatory clauses were found inapplicable, Boldt's claims still failed because its inability to perform in accordance with the Construction Schedule was a prior material breach of the Subcontract. Boldt responded to this assertion, in part, by incorporating the portion of its own motion for summary judgment arguing that Boldt could not be deemed in breach of the Subcontract for a delay attributable to a Turbine Vendor-Caused Delay. (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 14 n.14, Dkt. No. 152; *see also* Boldt's Mot. for Summ. J. at 9–10, Dkt. No. 132.) That argument relied on the Turbine Vendor-Caused Delay's Section 00552.35.3, which (subject to conditions, including notice) prevented Boldt from being deemed in breach of the Subcontract if it was delayed by a Turbine Vendor-Caused Delay. Section 00552.34.3, discussed above, provided the same protections in the event of an Owner and/or Purchaser-Caused Delay. Yet Boldt never

mentioned Section 00552.34.3 as creating a factual dispute warranting the denial of summary judgment as to the prior material breach issue.

Nor did the Court simply draw conclusions from Boldt's silence as to the issue of an Owner and/or Purchaser-Caused Delay. Boldt's briefing strongly implied that it had not availed itself of the remedies associated with an Owner and/or Purchaser-Caused Delay. On multiple occasions, Boldt emphatically stated that "[t]his case has nothing to do with Boldt seeking a Subcontract Revision" or words to a similar effect. (Boldt's Reply in Supp. of Mot. for Summ. J. at 3, Dkt. No. 173; *see also* Boldt's Opp'n to BVCI's Mot. for Summ. J. at 9 ("Boldt is not pursuing a Subcontract Revision, but is seeking damages for wrongful termination.").) And, in arguing against the applicability of the exculpatory clauses, Boldt observed that Section 00552.32.9 entitled Boldt to a Subcontract Revision if Boldt reasonably determined that crane pads were unsafe or inaccessible. (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 12.) Boldt did not, however, present any evidence demonstrating that it ever pursued such a Subcontract Revision.

While Boldt accuses BVCI of improperly withholding its argument regarding the impact of the Owner and/or Purchaser-Caused Delay provisions until its reply, the Court believes that BVCI's argument was appropriately made in reply. "[R]eply briefs are for replying, not for raising new matters or arguments that could and ought to have been advanced in the opening brief." *Sommerfield v. City of Chicago*, No. 06 C 3132, 2012 WL 3779104, at *1 (N.D. Ill. Aug. 31, 2012). Thus, "the scope of the reply brief must be limited to addressing the arguments raised" in the response brief. *United States v. Feinberg*, 89 F.3d 333, 340–41 (7th Cir. 1996). Part of Boldt's argument against the applicability of the exculpatory clauses was that BVCI relied on "an absurd interpretation" that would obviate BVCI's contractual obligations as to the

crane pads, access roads, and site laydown areas, and allow BVCI to "essentially sabotage Boldt's work with no grounds for recourse." (Boldt's Opp'n to BVCI's Mot. for Summ. J. at 12.) It was fair for BVCI to reply to that argument by pointing out that the grounds for recourse were limited to the relief permitted in the event of an Owner and/or Purchaser-Caused Delay.

Notably, it is not correct that BVCI asserted that Boldt did not seek relief for an Owner and/or Purchaser-Caused Delay for the first time in its reply brief. Rather, BVCI first raised the issue in its opposition to Boldt's motion for summary judgment. Specifically, in response to Boldt's contention that the original Construction Schedule ceased to apply by mid-September, BVCI explained that the "Subcontract outlines specific but limited opportunities for Boldt to obtain schedule relief for the acts or omissions of third parties" and cited the provisions for Owner and/or Purchaser-Caused Delays, Turbine Vendor-Caused Delays, and Force Majeure Events. (BVCI's Opp'n to Boldt's Mot. for Summ. J. at 6–7 & n.5, Dkt. No. 153.) Because "Boldt did not provide written notice for Schedule revisions for any of these reasons,"[3] BVCI argued that Boldt was not entitled to an extension of the Construction Schedule. (*Id.* at 7.)

Boldt, of course, had an opportunity to rebut that claim in its reply brief in support of its own motion. Yet Boldt's reply countered BVCI's contention not by pointing to notices of an Owner and/or Purchaser-Caused Delay but by arguing that that the baseline Construction Schedule on which BVCI's original notices of default were predicated "no longer applied or became immaterial." (Boldt's Reply in Supp. of Mot. for Summ. J. at 11–14.) True, BVCI raised the lack of Owner and/or Purchaser-Caused Delay issue in response to Boldt's motion for summary judgment rather than in the opening brief in support of its own motion. Still, the fact

---

[3] In claiming that Boldt did not provide written notice of a Turbine Vendor-Caused Delay, BVCI was incorporating its arguments that Boldt's supposed notices of such a delay were inadequate to fulfill the requirements set by the Subcontract. The Court agreed with that argument.

that BVCI did raise the issue and Boldt had the chance to reply undermines Boldt's contention that it had no opportunity to respond. *See Sommerfield*, 2012 WL 3779104, at *1 ("Adequate presentation obviously demands that each side has an opportunity to be heard.").

The bottom line of the Court's summary judgment ruling was that the exculpatory clauses barred the claims that Boldt asserted in this case involving the BVCI-supplied crane pads, access roads, and site laydown areas—claims Boldt never characterized as an improper denial of relief for an Owner and/or Purchaser-Caused Delay. Indeed, Boldt's briefs both in support of its own motion for summary judgment and in opposition to BVCI's motion never invoked "Owner and/or Purchaser-Caused Delay" to describe BVCI's alleged breaches of the Subcontract. Given Boldt's silence on the issue and its suggestions that it was not seeking the type of relief afforded by the provisions for such a delay, the Court had good reason to believe that Boldt's claims as to the BVCI-caused delays were after-the-fact claims that were barred by the Subcontract's exculpatory clauses. Nonetheless, the Court acknowledges that the question is close enough that it will consider Boldt's evidence on the merits and proceed with reconsideration.

## II.     Boldt's Compliance with the Owner and/or Purchaser-Caused Delay Provisions

In granting BVCI summary judgment as to Boldt's claims implicating the BVCI-furnished crane pads, access roads, and site laydown areas, the Court found that the exculpatory clauses protected BVCI from liability where Boldt seeks to litigate the suitability of those Construction Works for the first time in court. Underlying that conclusion was the Court's observation that Boldt did not claim that it timely pursued the Subcontract's procedures and remedies for an Owner and/or Purchaser-Caused Delay. In requesting that the Court reconsider its decision, Boldt points to "new" evidence that it claims demonstrates that it did properly seek

14

relief for an Owner and/or Purchaser-Caused Delay. (Boldt's Suppl. Statement of Additional Material Facts ("SSAF"), Dkt. No. 200.)[4]

According to Boldt, its evidence reveals that it provided numerous notices of an Owner and/or Purchaser-Caused Delay. Under the Subcontract, when Boldt believes that an Owner and/or Purchaser-Caused Delay "has occurred," it must provide BVCI with "written or electronic notice describing the alleged Owner and/or Purchaser-Caused Delay within three (3) days following the occurrence of an event [Boldt] believes is or may be an Owner and/or Purchaser-Caused Delay," and the notice must "describe the details of the Owner and/or Purchaser-Caused Delay and any effects on Subcontractor's performance of its obligations under th[e] Subcontract." (Subcontract § 00552.34.3.) In its summary judgment ruling, the Court discussed at length the form of notice in the Turbine Vendor-Caused Delay context. However, the notice provision for a Turbine Vendor-Caused Delay is not identical to the provision for providing notice of an Owner and/or Purchaser-Caused Delay. The procedures for providing notice of a Turbine Vendor-Caused Delay are as follows:

> [I]f [Boldt] believes an event constituting a Turbine Vendor-Caused Delay has occurred, [Boldt] shall give [BVCI] written or electronic notice describing the alleged Turbine Vendor-Caused Delay within five (5) days following the date on which [Boldt] became aware of the occurrence of such event. Within twenty (20) days after the date a Turbine Vendor-Caused Delay has actually caused a demonstrable delay or increase in cost in [Boldt's] performance of the Work, [Boldt] shall give [BVCI] written notice describing the details of Turbine Vendor-Caused Delay and any effects on [Boldt's] performance of its obligations under this Subcontract.

(Subcontract § 00552.35.2.)

---

[4] The Court notes that much of the evidence cited in Boldt's supplemental statement of additional material facts was part of the summary judgment record.

Thus, in the event of a Turbine Vendor-Caused Delay, Boldt must provide two notices: one within 5 days of an event that Boldt believes constitutes a Turbine Vendor-Caused Delay followed by a second notice within 20 days after the date the Turbine Vendor-Caused Delay actually causes a demonstrable delay or increase in cost to Boldt. By contrast, only one notice is required in the event of an Owner and/or Purchaser-Caused Delay. But, as with a 20-day notice of a Turbine Vendor-Caused Delay, a notice of an Owner and/or Purchaser-Caused Delay must provide details regarding the subject delay and describe how the delay affects Boldt's performance of its obligations under the Subcontract. The Court therefore finds that its analysis regarding the proper form of a 20-day notice of a Turbine Vendor-Caused Delay applies equally to the single notice of an Owner and/or Purchaser-Caused Delay.[5] As the Court explained in its summary judgment ruling, that means proper notice should "connect a specific act or omission on the part of [BVCI] with a concrete delay or increase in cost to Boldt, and should provide details as to the effects of that [Owner and/or Purchaser-Caused Delay] on Boldt's ability to perform as scheduled." (Summ. J. Ruling at 25.)

---

[5] That the form of notice for an Owner and/or Purchaser-Caused Delay is equivalent to the form of 20-day notice of Turbine Vendor-Caused Delay is reinforced by the slight differences in the definitions of the respective delays. As Boldt noted in its motion for summary judgment, a Turbine Vendor-Caused Delay requires only a "delay," whereas an Owner and/or Purchaser-Caused Delay requires a "delay in the critical path." (Boldt's Mot. for Summ. J. at 6 n.4; *see also* Subcontract § 00552.1.) As Boldt acknowledges, this is a higher standard. Moreover, Section 00552.34.2 provides that Boldt shall give notice when it believes that "an Owner and/or Purchaser-Caused Delay has occurred," whereas Section 00552.35.2 requires an initial notice when Boldt believes "an event constituting a Turbine Vendor-Caused Delay has occurred" followed by a second notice once "a Turbine Vendor-Caused Delay has actually caused a demonstrable delay or increase in cost." The former notice concerns the event that may be or may ripen into a Turbine Vendor-Caused Delay whereas the latter notice concerns the actual Turbine Vendor-Caused Delay. On the other hand, notice of an Owner and/or Purchaser-Caused Delay is required only when Boldt "believes an Owner and/or Purchaser-Caused Delay has occurred"—*i.e.*, once Boldt believes there is a critical path delay caused by BVCI. That makes the notice of an Owner and/or Purchaser-Caused Delay more akin to the 20-day notice of a demonstrable Turbine Vendor-Caused Delay.

One of the key flaws the Court found with respect to Boldt's purported 20-day notices of a Turbine Vendor-Caused Delay was that they lacked sufficient details regarding the nature of the delay and how the delay affected Boldt's ability to timely perform its work. The same is true with respect to Boldt's evidence of its notices of an Owner and/or Purchaser-Caused Delay. Indeed, Boldt points to numerous notices of impact. (BVCI's Resp. to Boldt's Suppl. Statement of Additional Material Facts ("RSSAF") ¶¶ 13–14, 16–17, 20, 24–27, 29–30, 32–35, 37, 39–40, Dkt. No. 215; SSAF, Exs. 13–14, 16–17, 20, 24–27, 29–30, 32–35, 38, 40–41, Dkt. Nos. 200-13–200-14, 200-16–200-17, 200-20, 200-24–200-27, 200-29–200-30, 200-32–200-35, 200-38, 200-40–200-41.) Many of those notices were introduced as evidence of a Turbine Vendor-Caused Delay. The Court found them unavailing as 20-day notices of Turbine Vendor-Caused Delay because they fell "well short of providing the level of detail regarding the Turbine Vendor-Caused Delay and its effects" and failed to show an actual delay. (Summ. J. Ruling at 22–23.) For the same reasons, those notices[6] also fail to supply adequate written notice of an Owner and/or Purchaser-Caused of Delay.

Next, Boldt claims that it began notifying BVCI of Owner and/or Purchaser-Caused Delays even before work on the Project began. In a July 18, 2019 letter, Boldt raised concerns with BVCI regarding foundation progress issues and schedule sequence issues that could potentially impact the Construction Schedule. (RSSAF ¶ 1.) The letter expressly stated that its purpose was to avoid impacts to the Construction Schedule. (SSAF, Ex. 1, Dkt. No. 200-1.) And given that work had not even started on the Project, the letter cannot be construed as describing an actual delay event. Boldt emphasizes the Subcontract's language requires Boldt to provide

---

[6] Some of the notices concern only the performance of the turbine vendor rather than BVCI's performance. (*E.g.*, RSSAF ¶ 14.)

notice within 3 days of the occurrence of an event it "believes is or ***may be*** an Owner and/or Purchaser-Caused Delay" to argue that notice of issues that may become an Owner and/or Purchaser-Caused Delay suffices. (Subcontract § 00552.34.2 (emphasis added).) However, the "may be" language must be read in light of the language that notice must be given only after Boldt "believes an Owner and/or Purchaser-Caused Delay ***has occurred***," (Subcontract § 00552.34.2 (emphasis added)), and the fact that an Owner and/or Purchaser-Caused Delay is defined to mean not just a delay but a "delay in the critical path" of Boldt's work (Subcontract § 00552.1). Thus, the "may be" language is best understood as simply recognizing that not every delay that Boldt believes may constitute an Owner and/or Purchaser-Caused Delay will, in fact, turn out to be a critical path delay. On the other hand, the requirement of notice only after the delay event "has occurred" precludes interpreting the "may be" language as equivalent to "may become." In short, a notice of an Owner and/or Purchaser-Caused Delay must come after the delay has materialized.

Similarly unavailing as notice of an Owner and/or Purchaser-Caused Delay is Boldt's August 8, 2019 email describing issues with the Project's site conditions affecting equipment mobility. (RSSAF ¶ 3.) There, Boldt expressly stated that the email was meant as a "notification of potential delays" and acknowledged the need for "further investiga[tion] . . . in order to obtain an accurate impact." (SSAF, Ex. 3, Dkt. No. 200-3.) That notice does not describe a delay that "has occurred" and did not (and could not without further investigation) provide details as to how the potential issue might affect Boldt's performance.

On August 15, 2019, Boldt sent BVCI two letters. Boldt expressly referred to the first letter as its notification of Owner and/or Purchaser-Caused Delays. (RSSAF ¶ 11.) In the purported notice, Boldt stated that it was "experiencing soil conditions that are preventing Boldt

from performing the Work and raises a significant safety concern." (*Id.*) Citing Section

00552.32.9, Boldt stated that "all work locations examined up to this point [were] unsuitable for

travel and access of the erection equipment" and demanded that BVCI "improve soil conditions

to accommodate safe operation and access of typical construction equipment prior to continuing

with the work." (*Id.*) The notice set forth largely conclusory allegations with sparse details as to

the alleged Owner and/or Purchaser-Caused Delay—left unexplained was the nature of the soil

deficiency and how BVCI should improve the soil conditions.[7] It did attach three photographs of

rough terrain cranes sinking somewhat into the soil, although the notice does not explain where

on the Project site this is occurring—*i.e.*, whether it was an area within BVCI's responsibility.

More importantly, the notice gave no substantive details as to how the soils were

affecting Boldt's performance of its Subcontract obligations. Boldt simply claimed that the soil

conditions were "preventing Boldt from performing the Work." (*Id.*) Left unsaid was what work

was being hindered by the issue. If the notice meant to claim that Boldt's work had come to a

complete standstill, that claim is contradicted by undisputed evidence showing that some work

was occurring at that time, albeit at a slower pace than planned. (*See, e.g.*, Boldt's Resp. to

BVCI's Statement of Material Facts in Supp. of its Mot. for Summ. J. ("Boldt's RSOF") ¶¶ 51,

66, Dkt. No. 160.) Later, the notice asserted that Boldt was incurring unspecified "additional

---

[7] Boldt never fully explains exactly what BVCI's Subcontract obligations were with respect to soils, and the Court is hardly certain that BVCI was responsible for the Project site's soil conditions generally. Rather, Section 00552.32.9 only says that if Boldt "reasonably determines, based upon the site conditions, that the Jobsite infrastructure conditions, including the roads, crane paths, or crane pads are unsafe or inaccessible" BVCI will provide a Subcontract Revision. By its terms, Section 00552.32.9 covers only infrastructure. And Boldt's notice was vague as to how the soil was impacting the BVCI-furnished Construction Works, like the crane pads, access roads, and site laydown areas. Elsewhere, the Subcontract states that Boldt "shall be aware of the Geotechnical Report attached herein which indicates the ground conditions upon which the mobile cranes and heavy equipment travel, and will be responsible for the safe travel and use of the cranes used for the Work." (Subcontract § 001100.1.) Boldt's notice does not state whether and how the soil conditions differed from the geotechnical report.

costs and experiencing schedule delays as a direct result" of BVCI's deficiency but that the "full impacts of this deficiency cannot be quantified as our teams do not know how quickly [BVCI] will rectify the conditions." (RSSAF ¶ 11.) While Boldt may not have been able fully to account for the impacts of the claimed delay, it should have been able to provide some explanation as to the tasks that Boldt had been unable to perform due to BVCI's supposed deficiency. Finally, Boldt did not actually seek a Subcontract Revision for an Owner and/or Purchaser-Caused Delay but simply reserved its rights to later seek additional compensation or a re-baselining of the Construction Schedule. (*Id.*)

Also on August 15, 2019, Boldt emailed its response to a notice BVCI sent it the day before regarding Boldt's failure to keep pace with the Construction Schedule. In its response, Boldt disputed responsibility for delays to the Construction Schedule and instead laid the blame on the soil conditions and other issues that were within BVCI's realm of responsibility. (*Id.* ¶ 12.) This email exhibits the same deficiencies as Boldt's supposed notice of Owner and/or Purchaser-Caused Delay submitted the same day. It speaks vaguely about issues and effects on Boldt's work. Further, the notice observed that the site conditions would "***potentially*** have an impact on the lifts as [Boldt] ha[s] ***reason to believe*** the site crane pads are not suitable to perform a lift safely." (*Id.* (emphasis added).) Again, a notice speculating about an issue that could cause delay in the future is not a notice of an Owner and/or Purchaser-Cased Delay.

Following BVCI's first notice of default, Boldt sent a letter dated September 6, 2019, advising BVCI that Boldt was stopping all crane operations effectively immediately. (RSSAF ¶ 44.) The letter stated that Boldt had "great concern regarding the dangerous and unpredictable soil conditions" at the Project site and explained that the soils were affecting the crane pads. (*Id.*) This letter provides more detail than previous communications regarding the issues Boldt was

encountering at that time. Still, the letter still provides no specifics regarding the nature of the soil issue. Indeed, Boldt stated that it did not "feel" that the crane pads generally "compli[ed] with prudent wind practices per the Subtract Articles" but failed to elaborate on the nature of such noncompliance. (*Id.*) For two specific crane pads, Boldt expressed concern over the wet and muddy ground conditions, but it is not clear why wet and muddy conditions were BVCI's fault. In any case, the Subcontract provided that "[d]uring periods of . . . wet grounds, or other unsuitable construction conditions, [Boldt] shall confine its operations to construction activities not adversely affected by the conditions." (Subcontract § 00554.4.5.) Yet Boldt does not justify halting all crane operations on the Project instead of halting crane operations at the two turbine sites identified. (*See* Subcontract § 00552.22.4 ("[Boldt] may not suspend performance of the Work except as directed by [BVCI] . . . .").) Finally, the most the letter says about how the suspension of the crane operations would affect Boldt's performance of the work is that "[f]ailure to resolve this issue immediately will result in the ***potential*** loss of workforce." (RSSAF ¶ 44.)

What is unclear across each piece of evidence that Boldt offers as a notice of an Owner and/or Purchaser-Caused Delay is how the event described effected Boldt's ability to timely complete its work. Some level of detail as to the effects of the delay event was critical since the protections afforded in the event of an Owner and/or Purchaser-Caused Delay only extend insofar as any delay was of no greater scope and duration than required by the effects of the delay event. (Subcontract § 00552.34.3.) While Boldt repeatedly promised to provide a quantification at some later date, it never did so prior to initiating litigation. Boldt's evidence also did little to advise BVCI contemporaneously as to which Construction Work deficiency caused an actual delay (to say nothing of a critical path delay) to the Construction Schedule and

the extent of said delay. In the August notices, Boldt complained generally about soil conditions impacting the travel of erection equipment and advised that the soil could, in the future, affect the erection work. (RSSAF ¶¶ 11–12.) At the same time, Boldt stated that its work was "***most significantly impacted*** by [BVCI's] failure to timely release Boldt to commence construction." (SSAF, Ex. 12, Dkt. No. 200-12 (emphasis added).)[8] Even then, Boldt suggests that it was able to avoid significant delays from that issue. (*Id.*)

By September 6, 2019, the soil issue had become a crane pad issue that was affecting the erection work. (RSSAF ¶ 44.) Even then, Boldt had not yet quantified the extent of delay caused by the soil conditions, no matter whether that delay came from soil-related issues with the crane pads, access roads, or site laydown areas. On reconsideration, Boldt argues that there were so many concurrent delays being caused by both BVCI and the turbine vendor, it was sufficient for it to provide a single cumulative impact. To support that contention, Boldt cites (for the first time) to Section 00552.19.4, which provides: "In estimating the impact of a proposed Subcontract Revision, [Boldt] shall account for . . . cumulative impacts associated with all previous Subcontract Revisions." (Subcontract § 00552.19.4.) That section is irrelevant, however, since Boldt, by its own admission, never sought a Subcontract Revision.

Moreover, the notion that a cumulative statement of impact is sufficient does not account for the fact that Boldt was the contractor on a project with multiple subcontractors, including the turbine vendor. Thus, separating the BVCI-caused impact from the turbine-vendor-caused impact was necessary because BVCI was directly responsible to Boldt for its own impacts whereas

---

[8] To the extent BVCI's failure to timely release Boldt to begin construction was an Owner and/or Purchaser-Caused Delay, it has nothing to do with BVCI-furnished Construction Works and thus would not be affected by the exculpatory clauses and Boldt's claims related to the crane pads, access roads, and site laydown areas. In any case, Boldt has never asserted that its breach of contract claim has anything to do with BVCI failing to timely authorize Boldt to begin construction. (*See* Compl. ¶ 49, Dkt. No. 1.)

BVCI presumably would pass through Boldt's turbine-vendor-related impacts to the turbine vendor itself. Ultimately, even if Boldt's notice of cumulative impact was sufficient, it actually undermines Boldt's claim that the Construction Schedule delays were caused by Boldt. Rather, in its September 18, 2019 assessment of the various impacts to the Project, Boldt claimed that, up to that date, it had only incurred a cost impact from the soil conditions and site preparations. (Boldt's Mot. for Reconsideration of Summ. J. for BVCI, Ex. 5, Dkt. No. 199-5.)

Here, Boldt's inability to provide coherent notice of any actual delay attributable to BVCI is particularly important given the undisputed evidence showing that Boldt itself was a significant cause of the delay to the Construction Schedule. As the Court observed in its summary judgment ruling, throughout August 2019, "Boldt was not keeping pace on critical tasks within its own realm of responsibility—namely, the preparation of lift plans and crane setup." (Summ. J. Ruling at 28–29.) Without lift plans, Boldt could not conduct any critical lifts on the Project (Boldt's RSOF ¶ 45), and cranes, of course, were necessary for erection activities. Boldt's own contribution to the delays to the Construction Schedule underscore the deficiency of Boldt's supposed notices of Owner and/or Purchaser-Caused Delay and their conclusory and unspecified assertions regarding the effects caused by the BVCI-supplied crane pads, access roads, and site laydown areas. The Subcontract makes clear that "[a]ny portion of a delay that is substantially due to [Boldt's] or any of its Sub-subcontractors' actions or inactions shall not be an Owner and/or Purchaser-Caused Delay." (Subcontract § 00552.1.) Yet there is no way of discerning from Boldt's notices how Boldt's untimely performance was caused by BVCI's actions or inactions rather than Boldt's. Put differently, the notices provide no indication how, had BVCI adequately performed, Boldt could have kept on schedule notwithstanding its failure to timely submit lift plans and have cranes in place. And that lack of detail also precludes a

proper evaluation of whether Boldt's "suspension of performance and extension of time [was] of no greater scope and of no longer duration than [was] required by the effects of the Owner and/or Purchaser-Caused Delay." (Subcontract § 00552.34.2.)

Further, even though Boldt wants to make the issue on reconsideration all about notice of an Owner and/or Purchaser-Caused Delay, the Court's decision on summary judgment was about the applicability of the exculpatory clauses. And its conclusion was that any claims were barred by the lack of evidence that Boldt "timely pursued the Subcontract's procedures ***and remedies*** for an Owner and/or Purchaser-Caused Delay." (Summ. J. Ruling at 18 (emphasis added).) For example, Boldt cites Section 00552.32.9 as setting forth BVCI's obligations regarding soil conditions. That section provides that where Boldt "***reasonably*** determines [that] the roads, crane paths, or crane pads are unsafe or inaccessible" BVCI "will provide a Subcontract Revision." (Subcontract § 00552.32.9 (emphasis added).) Even on reconsideration, Boldt presents no evidence that it pursued such a Subcontract Revision.

According to Boldt, the mandatory "will provide" language means that a Subcontract Revision must automatically follow with no need for further action from Boldt. The Court already rejected that contention in its summary judgment ruling. By way of further elaboration, Boldt's interpretation does not make sense in the context of the Subcontract. In particular, Section 00552.19.6 states that, in the event of an Owner and/or Purchaser-Caused Delay "that directly results in an ***actual, substantiated delay*** in Subcontractor's achievement of a milestone, or if the Subcontract otherwise entitles [Boldt] to a Subcontract Revision, [Boldt] ***may request*** a Subcontract Revision allowing an extension of the schedule, to the extent of the ***actual, substantiated delay***." (Subcontract § 00552.19.6 (emphasis added).) Reading Section 00552.32.9 together with Section 00552.19.6, it is plain that Section 00552.32.9's "will provide" language

24

creates an entitlement to a Subcontract Revision that Boldt still must request pursuant to Section 00552.19.6. Further, Section 00552.19.6's references to "actual, substantiated delay" reinforces that Boldt cannot revise the Subcontract simply by invoking Section 00552.32.9 but must also do enough to substantiate its claim of delay. None of Boldt's evidence shows that Boldt made any effort to substantiate its claims of BVCI-caused delay with more than its say-so.

In granting summary judgment as to Boldt's claims regarding the BVCI-furnished crane pads, access roads, and site laydown areas, the Court found that exculpatory clauses limited Boldt to the procedures and remedies offered for an Owner and/or Purchaser-Caused Delay. On reconsideration, Boldt fails to show that it properly pursued relief for an Owner and/or Purchaser-Caused Delay because it failed to submit adequate written notice and never requested a Subcontract Revision as a remedy.

### III. Lack of Sufficient Written Notice and Boldt's Liability

Even if it failed to comply with the procedures and seek the remedies for an Owner and/or Purchaser-Caused Delay, Boldt contends that it still cannot be responsible for delays that are attributable to BVCI. Boldt asserts several reasons for why it can still seek relief from BVCI for its failure to meet its Subcontract obligations as to the crane pads, access roads, and site laydown areas notwithstanding its failure to provide adequate written notice of an Owner and/or Purchaser-Caused Delay.

First, Boldt insists that it would be contrary to black-letter Illinois construction law for Boldt to be held liable simply because it failed to provide written notice of delay. The primary authority upon which Boldt relies for this claim is *Stone v. City of Arcola*, 536 N.E.2d 1329 (Ill. App. Ct. 1989). There, the defendant project owner claimed that the plaintiff contractor was liable for liquidated damages for delays outside of the contractor's control because the contractor failed to provide written notice of the delay. To that point, the Illinois Appellate Court observed

that "the failure of plaintiff to give written notice of the delay may be considered a waiver of a claim for delay, but the waiver of a claim for delay does not correspondingly dictate that the party waiving the delay be held liable for the delay." *Id.* at 1337 (internal quotation marks omitted). As an initial matter, this portion of *Stone* is arguably dicta, given that the Appellate Court's ultimate holding is that the liquidated damages provision was unenforceable against the contractor because none of the delays were attributable to the contractor. *Id.* That holding renders *Stone* inapposite to the circumstances here, where Boldt was concededly delayed in fulfilling its own responsibilities, which led to BVCI finding Boldt in default of its obligation to maintain the Construction Schedule. Consequently, Boldt is being held liable for its own delays.

Boldt asserts that there is no case in which a contractor has been held liable simply for failing to give adequate notice of a delay. Yet Boldt submitted an excerpt from a construction law treatise in support of its arguments that lists a case where that was exactly the result. Specifically, in *Abel Construction Co. v. School District of Seward*, 195 N.W.2d 744, 746 (Neb. 1972), the Nebraska Supreme Court affirmed a trial court's ruling that "determined as a matter of law that since the plaintiff had failed to request in writing an extension of the contract period as provided for in the construction contract the only question was the extent of the delay" upon which liquidated damages would be assessed. It observed that "[a] contractual requirement that requests for 'contract period' extensions must be in writing has been upheld by this court as binding." *Id.* at 748; *see also Olson Constr. Co. v. Com. Bldg. & Inv. Co.*, 256 N.W. 22, 25 (Neb. 1934) ("Courts have generally held that provisions requiring written notices for additional time must be complied with.").

Next, Boldt contends that because BVCI had actual notice of the issues with the crane pads, access roads, and site laydown areas, Boldt's failure to provide adequate written notice can

be excused. But the Subcontract's language made clear that written notice was a condition precedent to relief for an Owner and/or Purchaser-Caused Delay. For example, Boldt could only avoid being deemed in breach of the Subcontract because of an Owner and/or Purchaser "so long as the conditions of this Article 00552.34 are satisfied"—*i.e.*, Boldt provided adequate written notice. (Subcontract § 00552.34.3.) The same section reiterates that the protections are only available if Boldt "provides timely notice of the Owner and/or Purchaser-Caused Delay." (*Id.*) As the Court explained in its summary judgment ruling, "[w]hen a contract contains an express condition precedent, strict compliance with such a condition is required." *Credit Union 1 v. Carrasco*, 107 N.E.3d 1021, 1026 (Ill. App. Ct. 2018); *see also Fidelity Nat'l Title Ins. Co. of N.Y. v. Westhaven Props. P'ship*, 898 N.E.2d 1051, 1064 (Ill. App. Ct. 2007) ("In this case, the language of the partnership agreements clearly provides for written notice. To require less would not give effect to the parties' intent and would place a construction upon the partnership agreements that is contrary to the plain and obvious meaning of the language used.").

Of course, "[p]arties to a contract have the power to waive provisions placed in the contract for their benefit and such waiver may be established by conduct indicating that strict compliance with the contractual provisions will not be required." *Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. Ct. 1988). Accordingly, Boldt also argues that BVCI waived strict compliance with the notice requirement. Waiver is found where a party "has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right." *Id.* The only evidence Boldt offers for this contention is an August 21, 2019 letter responding to Boldt's August 15 "notice" of Owner and/or Purchaser-Caused Delay. In that letter, BVCI rejected Boldt's claim of delay and stated that it would "not address any cost and/or schedule relief requests due to this matter and expects Boldt to progress the performance of

Work in a safe and prompt manner." (RSSAF ¶ 21.) BVCI's response said nothing about notice but simply rejected Boldt's particular claim for "additional costs and delays due to BVCI." (SSAF, Ex. 21, Dkt. No. 200-21.) And BVCI predicated its rejection on the fact that the claimed costs and delays were "unsubstantiated" and were due, in part, to Boldt's own failures to timely submit lift plans and mobilize a necessary crane. (*Id.*) For these reasons, BVCI's letter can hardly be construed as its waiver of the requirement of notice for Owner and/or Purchaser-Caused Delays.

At bottom, the Subcontract's exculpatory clauses provided BVCI with broad protections against claims for the Construction Works it furnished to Boldt, including the crane pads, access roads, and site laydown areas. Any deficiencies as to the Construction Works had to be litigated through the Owner and/or Purchaser-Caused Delay mechanism. On the first round of summary judgment briefing, Boldt opted to argue that the exculpatory clauses had no applicability whatsoever with respect to crane pads, access roads, and site laydown areas. Now, having had the opportunity to present evidence as to the Owner and/or Purchaser-Caused Delay issue, Boldt still cannot show that the exculpatory clauses preclude its claims in this case. Consequently, Boldt's motion for reconsideration of the Court's order granting summary judgment in favor of BVCI is denied.

### IV.    Scope of Trial

Ultimately, this case is about whether BVCI had cause to terminate Boldt from the Project for cause. It is undisputed that shortly after Boldt began its work on the Project, it fell behind the Construction Schedule. Nor does Boldt dispute that it failed to timely perform critical tasks that were entirely within its control. In this case, Boldt has tried to shift blame for the delays to both BVCI and the Project's turbine vendor. However, in granting summary judgment in favor of BVCI as to Boldt's breach of contract claim, the Court determined that the

Subcontract set forth certain procedures for Boldt to follow during the course of its work to demonstrate delays outside of its control and to protect itself from liability for such delays. Boldt has failed to show that it followed those procedures. Consequently, BVCI had good reason to conclude that Boldt was in default of its Subcontract obligations. And when Boldt proved unable to get its work back on track, BVCI had the right to terminate Boldt for cause. Stated succinctly, BVCI properly terminated Boldt for cause and there is no jury issue regarding Boldt's claim for wrongful termination.

      Although BVCI did not move for summary judgment as to its own counterclaim, the Court's ruling on the motions for summary judgment has all but decided Boldt's liability. All that remains for trial is a determination of BVCI's damages. One category of damages that BVCI seeks is damages for delayed Project completion. Boldt contends that it should be able to raise the issue of whether it was truly responsible for the Project's delay at least as to those damages. However, the Court will not allow a trial on damages to turn into a liability trial regarding who was truly responsible for the delays to the Construction Schedule.[9] The Subcontract provides that Boldt "shall not be responsible or liable" for delays in completing its work insofar as the delays were caused by an Owner and/or Purchaser-Caused Delay or a Turbine Vendor-Caused Delay. (Subcontract §§ 00552.34.3, 00552.35.3.) Because Boldt did not take the steps necessary to establish either delay and failed to fulfill its own obligations under the Subcontract, Boldt will be fully responsible to BVCI for any damages resulting from its termination for cause.

---

[9] For this reason, the Court will not reconsider its ruling denying as moot the *Daubert* motions relating to the liability experts.

## CONCLUSION

For the foregoing reasons, Boldt's motion for reconsideration of the Court's order granting BVCI's motion for summary judgment (Dkt. No. 199) and its motion for reconsideration of the Court's order denying Boldt's motion for summary judgment (Dkt. No. 201) are both denied.

ENTERED:

Dated: October 2, 2023

_____
Andrea R. Wood
United States District Judge