**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BOLDT COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| and Counter-Defendant, | ) | |
| | ) | No. 19-cv-08383 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| BLACK & VEATCH CONSTRUCTION, | ) | |
| INC., | ) | |
| | ) | |
| Defendant | ) | |
| and Counter-Plaintiff. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant and Counter-Plaintiff Black & Veatch Construction, Inc. ("BVCI") served as the contractor for the construction of a 60-turbine wind farm in Good Hope, Illinois ("Project"). BVCI subcontracted with Plaintiff and Counter-Defendant The Boldt Company ("Boldt") to offload and erect the Project's wind turbines. When the Project fell behind schedule, BVCI terminated Boldt for cause. Boldt claimed that BVCI wrongfully blamed it for delaying the Project when BVCI and the Project's wind-turbine vendor were actually to blame for the Project getting off schedule. Boldt therefore brought this lawsuit, alleging that BVCI breached its subcontract with Boldt when it terminated Boldt from the Project. In turn, BVCI filed a counterclaim against Boldt, also for breach of contract. The Court granted summary judgment in BVCI's favor as to Boldt's claim, finding that there was no genuine dispute of material fact that BVCI properly terminated Boldt for cause due to its schedule default. The Court also denied Boldt's motion for summary judgment as to BVCI's counterclaim. With Boldt's liability on BVCI's counterclaim having been decided, the Court held a jury trial to determine BVCI's damages. Following a trial lasting approximately three weeks, the jury returned a verdict

awarding BVCI nominal damages of $1.00. Now before the Court are BVCI's motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) (Dkt. No. 326) and Boldt's motion to alter or amend judgment pursuant to Rule 59(e) (Dkt. No. 325). For the reasons that follow, both motions are denied.

## BACKGROUND

On February 8, 2019, BVCI entered into a prime contract under which it agreed to serve as the engineering, procuring, and construction contractor in connection with the Project. To erect the wind turbines, BVCI subcontracted with Boldt. Under the parties' subcontract ("Subcontract"), Boldt was to offload wind-turbine parts delivered by the wind-turbine vendor and then erect 60 wind turbines in accordance with the specified construction schedule. The Subcontract called for Boldt to complete erection of all 60 wind turbines by November 8, 2019.

Boldt began erecting the wind turbines in August 2019. Quickly, Boldt encountered numerous difficulties that delayed its work on the Project. By mid-August, BVCI began raising concerns to Boldt regarding its failure to adhere to the construction schedule. Boldt, however, insisted that the delays were not its fault. Nonetheless, by the beginning of September, Boldt had yet to fully erect a single wind turbine. Thus, on September 3, 2019, BVCI issued Boldt a notice of default, citing Boldt's failure to meet its schedule obligations. BVCI issued a second notice of continued default on September 7, 2019, accusing Boldt of rejecting its obligation to cure its schedule default. That led to extended discussions between BVCI and Boldt about getting the Project back on track.

Beginning on September 11, 2019, BVCI took over Boldt's offloading responsibilities to allow Boldt to focus solely on erection work. Then, on September 20, 2019, BVCI reduced Boldt's scope of erection work to 40 turbines and took over for Boldt as to the other 20 turbines. Those efforts were unsuccessful in getting the Project back on schedule. Thus, on September 27,

2019, BVCI notified Boldt that, due to its continued default and unwillingness to cure that default at its own expense, BVCI was terminating Boldt's work on the 20 wind turbines that previously had been removed from Boldt's scope of work. Subsequently, on September 30, 2019, BVCI gave Boldt notice that Boldt's remaining work on the Project was terminated for cause. BVCI then assumed responsibility for the completion of Boldt's work. BVCI did not complete work on the Project until February 2020.

Following its termination, Boldt sued BVCI for breach of the Subcontract in December 2019. In response, BVCI asserted a counterclaim alleging that Boldt breached the Subcontract by failing to complete its work on the Project in a timely manner. The parties then filed cross-motions for summary judgment focused on whether BVCI properly terminated Boldt pursuant to the Subcontract's "Termination for Cause" provision. The Court ultimately granted summary judgment in BVCI's favor as to Boldt's breach-of-contract claim and denied summary judgment to Boldt as to BVCI's counterclaim. The bottom line of the Court's summary judgment ruling was a finding as a matter of law that BVCI properly terminated Boldt for cause due to its failure to timely perform its work on the Project. After a trial on the limited issue of BVCI's damages, the jury returned a verdict awarding nominal damages of $1.00.

## DISCUSSION

Both BVCI and Boldt have filed post-trial motions. BVCI asks that the Court vacate the jury's verdict awarding it only nominal damages and order a new trial on damages. For its part, Boldt argues that, given the jury's award of nominal damages, it is now entitled to collect from BVCI as part of this action the amounts that it is owed for its work on the Project. The Court begins with BVCI's motion for a new trial before turning to Boldt's motion.

## I.        BVCI's Motion for a New Trial

A party may prevail on a motion for a new trial under Rule 59(a) only "if the jury's verdict is against the manifest weight of the evidence, or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (internal quotation marks and alteration omitted). "In assessing a motion for a new trial, the trial judge must 'perform its own assessment of the evidence presented,' and do so 'neutrally.'" *Magnuson v. Trulite Glass & Aluminum Sols., LLC*, No. 19 C 6158, 2024 WL 1216338, at *2 (N.D. Ill. Mar. 21, 2024) (quoting *Lewis v. McLean*, 941 F.3d 886, 893 (7th Cir. 2019)). However, "[a] new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks the conscience." *Davis v. Wis. Dep't of Corrs.*, 445 F.3d 971, 979 (7th Cir. 2006) (internal quotation marks omitted).

### A.        Manifest Weight of the Evidence

BVCI first challenges the sufficiency of the evidence supporting the jury's verdict. Where a party argues that the jury's verdict is against the manifest weight of the evidence, a district court has a "narrow role," which "is to determine if a reasonable basis exists in the record to support the verdict." *Lewis*, 941 F.3d at 893 (internal quotation marks omitted). To set aside a jury's verdict, a district court must conclude that "no rational jury could have rendered it." *Id.*

Here, the sole question before the jury was the proper amount of money to award BVCI to compensate it for Boldt's breach of the Subcontract. In Illinois, "[t]he party claiming damage bears the burden of proving those damages to a reasonable degree of certainty." *TAS Distrib. Co. v. Cummins Eng. Co.*, 491 F.3d 625, 632 (7th Cir. 2007). That burden cannot be met through "conjecture or speculation." *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 793 (Ill. App. Ct. 2008). On the other hand, absolute certainty is not required. *Id.* "Rather, the evidence need only afford a

4

reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct." *Belleville Toyota, Inc. v. Toyota Motor Sales, USA, Inc.*, 770 N.E.2d 177, 199 (Ill. 2002). But where "the party having the burden of proof establishes that [it] is entitled to damages, yet fails to establish a proper basis from which those damages can be computed, [it] is entitled to only nominal damages." *Brewer v. Custom Builders Corp.*, 356 N.E.2d 565, 573 (Ill. App. Ct. 1976).

Generally, "damages for breach of contract should place an aggrieved party in the position they would have been in had the contract been performed." *Castricone v. Michaud*, 583 N.E.2d 1184, 1185 (Ill. App. Ct. 1991). "[A]ll damages foreseeably resulting from a breach are generally recoverable." *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 123 N.E.3d 1177, 1188 (Ill. App. Ct. 2019). In cases of breach of contract due to defective performance, "the general measure of damages is the cost of repairing the defects and/or completing the project." *Kirkpatrick*, 894 N.E.2d at 798. Specifically, damages are equal to "the difference between the cost of constructing, by contract, the building the contractor agreed to put up, and the fair cost market price of erecting such building." *Castricone*, 583 N.E.2d at 1185 (internal quotation marks omitted). Moreover, only ***reasonable*** costs to complete may be awarded. *See, e.g.*, *N. Ill. Gas Co. v. Vincent DiVito Constr.*, 573 N.E.2d 243, 251 (Ill. App. Ct. 1991) ("[T]he trial court is not required to calculate the amount of damages at the highest possible cost but only at a 'reasonable cost.'").

In this case, BVCI argued to the jury that it incurred costs of $38.9 million to complete Boldt's scope of work. It then requested that the jury award it damages of $29.4 million. That figure consisted of $38.9 million in costs to complete Boldt's scope of work less the $15.4 million Subcontract price, which resulted in $23.5 million in incremental costs to complete. To

that figure, BVCI added $5.8 million for its overhead and general administrative costs,[1] yielding its $29.4[2] million award request. However, the jury awarded BVCI only nominal damages of $1.00, indicating that the jury concluded that BVCI had not presented evidence from which it could determine the fair and reasonable amount of BVCI's damages.

In awarding BVCI nominal damages, the jury necessarily concluded that BVCI had not satisfied its burden of producing evidence from which the jury could calculate BVCI's reasonable costs to complete Boldt's scope of work to a reasonable degree of certainty. BVCI contends that this verdict was against the manifest weight of the evidence, or otherwise suggests a compromise verdict, because BVCI introduced extensive evidence cataloguing the costs it incurred in taking over Boldt's work on the Project. But despite BVCI's protestations to the contrary, a neutral view of the evidence reveals ample reasons for the jury to distrust BVCI's damages estimate.

Summarized at a high level, BVCI arrived at its damages claim in two steps. First, BVCI internally compiled all its post-termination costs of performing Boldt's work. To explain how that process worked, BVCI relied on the testimony of Nilesh Zirpe, BVCI's assigned project manager for the Project. Zirpe testified that BVCI stored all the cost information for its various projects in an internal database known as the Business Intelligence Center. He explained that when an invoice for a project-related expense is input into the system, it is assigned a cost code. The cost code is a numerical code associated with a category generally identifying the purpose

---

[1] Pursuant to the Subcontract, the overhead and general administrative costs were calculated as a percentage of BVCI's costs of completion.

[2] The Court notes that BVCI's math does not quite add up, as 23.5+5.8=29.3 not 29.4. Though it is not clear from the trial record, the Court assumes that the discrepancy was a product of approximation or rounding of the constituent costs.

for which the expense was incurred. Zirpe further explained that, upon Boldt's termination from the Project, two new series of cost codes were opened at 9001 and 9002 to identify the costs BVCI incurred for the turbine unloading and erection work it took over from Boldt. Within those two series were multiple subcodes that identified the cost category with more detail. But Zirpe stated that any cost listed under a 9001 or 9002 code was regarded as a cost that BVCI incurred while performing work originally within Boldt's scope of work. Thus, when Boldt initiated the present action and BVCI needed to quantify its damages, BVCI began by compiling all the costs assigned to one of the Boldt-associated codes (*i.e.*, those within the 9001 or 9002 series).

Once it had compiled the relevant cost data, BVCI submitted that data to its damages expert, Neil Miltonberger, who then assessed the reasonableness of BVCI's claimed costs to complete Boldt's work. Between February and May 2020, Miltonberger held ten meetings with BVCI personnel, with Zirpe serving as his main point of contact. At those meetings, Miltonberger worked with BVCI personnel to review all of BVCI's costs coded as incurred within Boldt's scope of work to ensure that each cost was properly attributable to Boldt. Miltonberger testified that he began his analysis by looking to the cost codes and, from there, he turned to explore the underlying costs in greater depth. At times, his analysis required Miltonberger to review the invoice supporting a particular cost and discuss with BVCI personnel the purpose for which the cost was incurred. And for some costs, Miltonberger worked with BVCI to allocate a percentage of responsibility between Boldt and BVCI.

At trial, Zirpe and Miltonberger's testimony formed the foundation for BVCI's claimed reasonable basis for calculating its damages. Essentially, BVCI presented the jury with a single theory of damages that required the jury to credit both (1) Zirpe's testimony that BVCI had compiled its costs in performing Boldt's work with a reasonable degree of accuracy, and (2)

Miltonberger's testimony that those costs were reasonably and necessarily incurred. If the jury found that one or both witnesses lacked credibility, then it would be left with no other non-speculative means of calculating BVCI's damages. And the record reveals multiple issues regarding both Zirpe's and Miltonberger's testimony that could cause a rational jury to doubt the accuracy and reasonableness of BVCI's claimed costs of completion.

To begin, BVCI's determination of its costs incurred in performing Boldt's work relied in substantial part on its internal cost codes—namely, the 9001 and 9002 series codes opened following Boldt's termination. Yet Zirpe's testimony gave the jury reason to doubt the accuracy of those cost codes. Even for the typical project, Zirpe acknowledged that errors would arise with the cost coding that required correction. And the Project was far from typical, as new codes had to be opened quickly following Boldt's abrupt termination. Zirpe conceded that BVCI had to make the transition to direct work on the fly and the process was not flawless. Later, when BVCI was tasked with producing a damages estimate for this case, Zirpe noticed that the accuracy of some cost codes was not quite reasonable. As Zirpe and other BVCI personnel reviewed the Project's costs with Miltonberger, BVCI discovered numerous cost-coding errors. Thus, at the same time that they were working with Miltonberger to formulate BVCI's claim for damages, BVCI personnel were also correcting cost-coding errors as such errors arose. Altogether, BVCI ended up transferring $17.7 million in Project costs into a new cost code.

At trial, BVCI attempted to minimize the materiality of its reclassification of so many costs. It emphasized that $12.5 million in costs were simply transferred between Boldt-associated cost codes, such that the reclassification had no impact on BVCI's estimated costs of completion. However, even where the recoding did not add to BVCI's damages claim, the fact that such a substantial amount of BVCI's claimed costs needed to be corrected could cause a rational jury to

doubt the overall accuracy of BVCI's numbers. Indeed, the jury saw that, on January 30, 2020, just before BVCI began the recoding process, Zirpe sent an email addressing an insurance claim for blade-damage costs in which he indicated that he did "not believe what we are seeing in the system is trustworthy." And the cost codes were the starting point of Miltonberger's analysis; if the jury was skeptical of the accuracy of such coding, it could reasonably distrust his subsequent analysis.

True, BVCI's corrections of the coding errors may well have been a genuine effort by BVCI to improve the accuracy of its data. But Miltonberger acknowledged that cost coding was a subjective process. Moreover, BVCI's recoding effort occurred during its meetings with Miltonberger to formulate BVCI's damages claim against Boldt. Notably, the recoding did result in $2.5 million being transferred to Boldt cost codes from non-Boldt codes. Thus, the jury could reasonably have been wary of BVCI assigning costs to Boldt based on initially faulty cost codes and then, in the course of preparing its claim against Boldt, making corrections that ultimately attributed an additional $2.5 million to Boldt. Moreover, the Court notes that the jury reasonably could have viewed Zirpe as being cagey when responding to questions about the trustworthiness of the cost codes. For example, he at times described BVCI's cost codes as "accurate for what they are" and stated that the costs coded to Boldt were deemed to be "trustworthy" only "after [Miltonberger's] involvement."

Turning to Miltonberger's involvement, the record at trial was opaque as to the process by which Miltonberger arrived at his conclusion that BVCI's damages request was reasonable. Miltonberger's and Zirpe's testimony generally described the process as follows: BVCI had ten meetings with Miltonberger where the group reviewed BVCI's claimed costs line by line—often reviewing supporting invoices, other times following up with other BVCI personnel for more

details regarding a particular cost, and, in the end, arriving at a cost of completion estimate that Miltonberger deemed reasonable. The jury saw no evidence of contemporaneous notes documenting the group's process for reviewing costs, and the relatively little evidence memorializing their discussions was limited to a few brief notes indicating that a particular cost required follow-up. In short, Miltonberger took numbers from BVCI, reviewed them, excluded about $2 million of costs he determined unrelated to Boldt's work, and declared the final request reasonable. With such little insight into what informed Miltonberger's reasonableness determination, BVCI bore the risk that the jury would decline to credit a conclusion supported mostly by Miltonberger's say-so based on his education and experience. *See Ent. USA, Inc. v. Moorehead Commc'ns, Inc.*, 897 F.3d 786, 794–96 (7th Cir. 2018) (affirming that the plaintiff failed to prove the amount of its damages with reasonable certainty where its "estimate was flawed, and its data sources and methods were too opaque for the district court to verify the estimate independently").

That BVCI relied extensively on Miltonberger's largely conclusory statements of reasonableness points to a bigger weakness in its evidentiary showing. For the most part, BVCI tended to conflate the question of reasonableness with the question of whether the costs it sought were incurred in performing Boldt's turbine unloading and erection work. But whether BVCI incurred a cost doing work that was originally within Boldt's scope is a different question from whether all or part of that cost was reasonably incurred. It is not enough for a contractor "to say, 'These are our total costs. Pay them, together with a reasonable profit.' Some proof of reasonableness is required." *G.M. Harston Constr. Co. v. City of Chicago*, 371 F. Supp. 2d 949, 953 (N.D. Ill. 2005); *cf. Gulf States Protective Coatings, Inc. v. Caldwell Tanks, Inc.*, No. 3:15CV-00649-JHM, 2019 WL 7403970, at *19 (W.D. Ky. June 18, 2019) (finding that, under

Kentucky law, a project owner "is entitled to recover on its counterclaim not what it may have seen cause to expend in completing [the contractor's] work but to recover only what was reasonably necessary for it to expend to complete the work" (internal quotation marks omitted)); *U.S. ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Constr., Inc.*, 49 F. Supp. 3d 1031, 1063 (M.D. Fla. 2014) (explaining that Texas law holds that "[m]ere evidence of out-of-pocket costs is insufficient to support a damages award absent competent proof that the expenditures were reasonable and necessary"). Costs that are incurred due to a contractor's "inefficiency or extravagance" are not reasonable and subject to reimbursement. *G.M. Harston*, 371 F. Supp. 2d at 952.

Reasonableness undoubtedly loomed large for the jury in this case. BVCI told the jury that it incurred costs of $38.9 million to complete work that it originally subcontracted to Boldt for $15.4 million. Put differently, BVCI's costs to complete were about 2.5 times the original Subcontract price; and it requested a damages award of $29.4 million, about double the Subcontract price. The jury may have questioned why and how costs so disproportionate to the Subcontract price were nonetheless reasonable and directly traceable to Boldt's breach.

Yet BVCI's presentation at trial devoted relatively little time to explaining why its costs to do Boldt's work had ballooned beyond what was originally anticipated. That is not to say that BVCI did not attempt to explain why its work on the Project ended up being so costly. For example, BVCI asserted that Boldt's schedule delays meant BVCI had to perform its work through the winter, which resulted in increased costs. BVCI also claimed that it had to expedite its work to avoid liquidated damages under the prime contract, which required it to procure more cranes and hire more labor than originally planned. Still, there was a dearth of testimony or evidence explaining the magnitude of those extra costs.

As even BVCI acknowledged, the biggest reason for BVCI's substantial costs was its own decision to take on Boldt's work itself. Prior to the Project, BVCI had never self-performed turbine-erection work and instead hired subcontractors. According to BVCI, self-performing Boldt's work was the only feasible option because there were no other subcontractors readily available to take on the work on such short notice. At the same time, one of BVCI's witnesses, Jason Schottler, acknowledged that there were subcontractors who could join the Project, just not immediately,[3] and framed BVCI as being presented with a choice of waiting until one of those subcontractors became available[4] or proceeding on its own. Schottler explained that BVCI was confident enough in its ability to do the erection work that it decided to proceed on its own. It would not be irrational if the jury concluded that it would be unreasonable to hold Boldt liable for BVCI's costs of learning how to do the erection work on the fly, if it believed that those costs could have been avoided by waiting for a subcontractor experienced in turbine work to become available. *Cf. Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 53 (Ill. App. Ct. 2013) ("The so-called avoidable consequences doctrine requires one injured by a breach of contract to use all reasonable means to minimize his damages." (internal quotation marks omitted)).

Although BVCI thought it could most efficiently complete Boldt's work by doing it itself, it may have miscalculated. The evidence tended to show that BVCI struggled to learn how to do the erection work, which resulted in additional delays and costs. Further, Boldt introduced

---

[3] Indeed, two subcontractors with wind-turbine experience did assist BVCI in completing its work on the Project.

[4] Schottler explained that waiting for more experienced subcontractors would have exposed BVCI to liquidated damages, making self-performance the only feasible option. But the jury never heard details about how and why BVCI's analysis led it to that conclusion. On the other hand, the jury did hear that BVCI was able to negotiate a schedule extension with the Project's owner, which allowed BVCI to avoid liquidated damages.

evidence of a retrospective analysis that BVCI conducted of all aspects of its work on the Project

that revealed numerous inefficiencies. For example, one BVCI employee provided the following

observation based on his involvement on the Project:

> The lack of an understood, structured internal communication framework between departments left many items done incorrectly, added time to the [P]roject and decreased morale. Too many layers of management combined with often zero communication between what should have been a natural conversational flow-engineering, construction management, quality control, etc., caused many problems including: lack of understanding on where workers should be in the field, lack of appropriate documentation required for the proper administration of the [P]roject (such as people leaving before they signed off on required documentation), difficulties in managing project schedule planning and billing, and often leaving staff simply without work or waiting for direction.

That post-mortem document also listed myriad areas for BVCI to improve upon for future wind

projects. The jury also heard that BVCI has not self-performed wind-turbine erection work since

the Project. If the jury believed that BVCI's own performance issues were a significant cause of

its skyrocketing costs of completion, the jury could have reasonably deemed costs attributable to

BVCI's subpar performance unreasonable. *Cf. Amp-Rite Elec. Co. v. Wheaton Sanitary Dist.*,

580 N.E.2d 622, 642 (Ill. App. Ct. 1991) ("As in all breach of contract cases, the costs must be

tied in to fault on the defendant's part.").

To the extent Miltonberger substantively discussed the reasonableness of BVCI's costs,

he mainly testified about the reasonableness of the rates BVCI paid for labor and equipment. He

did opine that the fact that BVCI had to do the work in winter weather conditions played a role in

increasing the cost of the work but he made no attempt to quantify that impact. Indeed,

Miltonberger spoke in generalities about increased costs, but he had nothing to say about why it

was reasonable for BVCI's costs to increase to such a great degree. Further, Miltonberger took

the position that even costs traceable to BVCI's own performance issues were properly included

in its claim against Boldt—he claimed Boldt was ultimately responsible because it breached the

Subcontract. That position is not compelled as a matter of law, leaving the jury free to disagree if it found those costs not reasonably incurred.

By contrast, the jury heard Boldt's rebuttal expert, Sam Hadley, raise substantial questions about the reasonableness of BVCI's claimed costs. Among other things, Hadley testified she believed that BVCI incurred unreasonable extra costs from using more cranes over a longer period of time than what BVCI and Boldt had originally planned for Boldt's scope of work. She noted that BVCI's claim sought $17 million in crane-rental costs, which by itself exceeded the original Subcontract price. According to Hadley, the reasonableness of those costs required extensive technical analysis of why and how the cranes were used, and she faulted Miltonberger for not having done any such analysis.

BVCI asserts that Boldt's evidence, at most, would have reduced the requested damages figure by $9 million, and thus it was against the manifest weight of the evidence for the jury to award nominal damages rather than a reduced $20 million sum. This contention apparently assumes that the jury's verdict was based on Boldt's failure-to-mitigate affirmative defense, which Boldt bore the burden of proving. *E.g.*, *Mayster v. Santacruz*, 163 N.E.3d 246, 256 (Ill. App. Ct. 2020) ("The party asserting failure to mitigate damages bears the burden of proof as to the extent of nonmitigation."). However, the jury marked "No" in response to the question on the verdict form asking "Did BVCI present evidence from which you can determine the fair and reasonable amount of its damages."[5] The jury's verdict was explicitly based on the failure of BVCI's proof, not on the success of Boldt's affirmative defense.

_____

[5] BVCI separately argues that the verdict form was inconsistent with the jury instructions. But the instruction was a slightly modified version of the applicable Illinois Pattern Civil Jury Instruction, 700.13V ("Did [plaintiff's name] present evidence from which you can determine the fair and reasonable value of loss?"), consistent with Illinois law, and accurately framed the issue before the jury. *See, e.g.*,

In sum, BVCI went all in on a theory of damages that supported only a single number—approximately $38.9 million—as BVCI's costs to complete Boldt's scope of work. The jury was asked to calculate that figure by relying on numbers that BVCI assigned to Boldt based on subjective cost codes of questionable accuracy. As proof of the reasonableness of those costs, BVCI introduced the testimony of an expert who offered relatively threadbare opinions based on a process that he did not describe with any real specificity. Given the concerns surrounding both BVCI's numbers and its expert's review, it was rational for the jury to decide that either or both were untrustworthy. While absolute certainty of the amount of damages is not required, if the jury determined that it could not even reasonably approximate BVCI's damages with the evidence provided, then it properly awarded nominal damages. Accordingly, the jury's verdict that there was insufficient evidence for it to determine the fair and reasonable amount of BVCI's damages was not against the manifest weight of the evidence.

## B. Unfairness

Despite various issues with its own evidence, BVCI contends that the jury's verdict awarding nominal damages must have been a product of confusion borne of some erroneous decision by this Court that rendered the trial unfair to BVCI. "[C]ivil litigants are entitled to a fair trial, not a perfect one [and] a new trial will not be ordered unless there was an error that caused some prejudice to the substantial rights of the parties." *Wilson v. Groaning*, 25 F.3d 581, 584 (7th Cir. 1994); *see also Cefalu v. Rocuskie*, No. 12 C 5995, 2014 WL 1563804, at *2 (N.D. Ill. Apr. 17, 2014) ("[T]he party seeking a new trial based on alleged legal errors bears a heavy burden." (internal quotation marks omitted)). That will occur "only if the error has a substantial

---

*EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) ("Our case law requires only that the verdict form not be confusing or misleading to the jury.").

and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012) (internal quotation marks omitted). Put differently, "there must be a significant chance that the flawed ruling affected the outcome of the trial." *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 634 (7th Cir. 2018).

### 1.    *Descoped Work*

BVCI argues that it suffered unfair prejudice because this Court unfairly allowed Boldt to present evidence bearing on Boldt's liability even though the trial was limited solely to the issue of BVCI's damages. In particular, BVCI faults this Court for permitting Boldt to introduce evidence in support of its contention that BVCI's failure to give contemporaneous notice of its claims related to descoped work precluded it from recovering damages for that work.

When the parties speak of "descoped" work, they are referring to the pre-termination work that BVCI took over from Boldt on September 11, 2019 and September 20, 2019, in an effort to get the Project back on schedule. Prior to trial, the Court rejected multiple arguments that Boldt had raised regarding descoped work. In denying Boldt summary judgment, the Court concluded as a matter of law that BVCI's termination of Boldt for cause encompassed the supposedly descoped work. Then, in a motion *in limine* ruling, the Court found that "no purported reduction to the scope of Boldt's work was ever made effective under the Subcontract," and therefore "Boldt cannot argue to the jury that this case involves anything other than a termination of its entire scope of work." (Oct. 23, 2023 Order at 4, Dkt. No. 273.)

Nonetheless, early in the trial, Boldt indicated that it had a new argument for why BVCI could not recover for work it had removed from Boldt's scope prior to its termination. Specifically, Boldt relied on a provision in the Subcontract that required BVCI to give written notice of its claims within three days of an event giving rise to a claim or else such claim would

be waived. Boldt argued that because BVCI never gave the requisite notice of claims regarding the offloading work that it took over from Boldt on September 11, 2019 and the 20 wind turbines it took over on September 20, 2019, BVCI had waived its right to obtain damages associated with that work. This was a new argument. While the Court was dubious that this notice issue would cause it to revisit its earlier conclusion that BVCI could collect damages for Boldt's entire scope of work, it nonetheless decided to allow Boldt to adduce testimony concerning notice. The Court noted that the risk of prejudice from taking such evidence could be ameliorated by a simple curative instruction. At the same time, the Court admonished Boldt against using the term "descope."

Just before BVCI rested its case, the Court heard argument concerning testimony from a BVCI witness, Schottler, suggesting that BVCI had partially terminated Boldt's work earlier than September 27, 2019. That testimony conflicted with the Court's finding on summary judgment that Boldt had not been partially terminated until September 27, and therefore gave the Court cause to reconsider whether BVCI had either descoped or partially terminated part of Boldt's work earlier in September.[6] For that reason, the Court decided to allow Boldt, in its case, to put on evidence related to its contention that Boldt's offloading work and erection of 20 wind turbines had been descoped. At the same time, the Court expressed skepticism that BVCI could not recover its costs for that work regardless of whether it was termed a descoping. Although it allowed Boldt's proof, the Court advised the parties that if the evidence did not reveal a disputed factual issue for the jury regarding notice or descoping, those issues would be decided as a

---

[6] As the Court advised in each of its motion *in limine* rulings, its pretrial evidentiary rulings were necessarily preliminary and subject to modification, where necessitated by developments at trial.

matter of law by the Court. That was ultimately the outcome. Thus, the jury was instructed as follows:

> During the course of the trial, the jury has heard evidence and argument about whether certain portions of Boldt's scope of work (namely, offloading work and erection of 20 of the turbines) may have been descoped as opposed to terminated for cause under the Subcontract. You need not decide that issue. The Court has determined that BVCI may recover damages for the work that Boldt has argued was descoped. Therefore, you should not make any distinction between descoped work and work terminated for cause when you are determining the existence and amount of BVCI's cost of completion damages.

(Jury Instructions at 23, Dkt. No. 313.)

Even though the jury was instructed that BVCI was entitled to recover damages for Boldt's entire scope of work and that the descoping issue should not factor into its deliberations, BVCI contends that it suffered unfair prejudice simply from the fact that the jury was allowed to hear evidence and argument about descoping. The Court rejects BVCI's characterization of notice and descoping as liability issues. The question of liability that was decided on summary judgment was whether BVCI properly terminated Boldt for cause, which the Court answered in the affirmative. Whether BVCI could recover damages associated with supposedly descoped work was, by its own terms, an issue of damages. Accordingly, when the Court discussed the matter on summary judgment, it did so under a subsection entitled "Damages." (Mar. 30, 2023 Mem. Op. and Order at 34, Dkt. No. 190.) Similarly, the new notice issue also was an issue of damages, as Boldt's contention was that notice was a pre-condition to collecting damages for the descoped work. Evidence on both issues did not implicate the propriety of Boldt's for-cause termination.

Setting aside BVCI's characterization of the issue, the Court understands the core of BVCI's objection to be that it was prejudiced by the jury hearing evidence and testimony regarding a matter that it was ultimately not asked to decide. Yet the jury received a clear

instruction not to consider the issue in its deliberations, and "juries are presumed to follow limiting and curative instructions." *Karahodzic v. JBS Carriers, Inc.*, 881 F.3d 1009, 1015 n.2 (7th Cir. 2018). Especially given the concerns regarding the evidence properly before the jury (as discussed above), the Court finds no reason to believe that the admission of evidence that the jury was later instructed to disregard proved dispositive to its verdict finding that BVCI had failed to provide a reasonable basis for the calculation of its damages. *See, e.g.*, *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007) ("Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction."). Therefore, the preliminary admission of evidence and argument about the descoping issue does warrant a new trial.

### 2.    *Excluded Evidence Related to Boldt's Liability*

At the same time that BVCI asserts that the Court improperly allowed Boldt to introduce liability-related evidence, BVCI also argues that the Court erroneously excluded BVCI from introducing evidence related to Boldt's liability. BVCI's argument is predicated on its assertion that, because Boldt was permitted to introduce evidence and testimony questioning BVCI's post-termination performance, BVCI should have been allowed to introduce evidence as to Boldt's pre-termination performance. The Court disagrees. Pre-termination evidence of Boldt's performance was largely irrelevant insofar as it concerned the previously decided question of whether Boldt was properly terminated for cause. On the other hand, evidence of BVCI's post-termination performance of Boldt's work related to the reasonableness of BVCI's damages. As discussed above, BVCI took the position that all costs it incurred in performing Boldt's work were reasonable. That made the quality of BVCI's performance of Boldt's work directly relevant, as the evidence tended to rebut the reasonableness of BVCI's costs.

### 3.    *Undisclosed Expert Opinions*

According to BVCI, Boldt's damages expert Hadley offered four opinions that were not previously disclosed in accordance with Federal Rule of Civil Procedure 26(a)(2). "Rule 26(a)(2) explicitly requires an expert witness to provide a report containing [her] opinions as well as the basis and reasons for those opinions." *Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 727 (7th Cir. 1996). And Federal Rule of Civil Procedure 37(c)(1) provides that any failure to provide the information required under Rule 26(a) will preclude the use of that information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). BVCI therefore argues that the Court's failure to exclude Hadley's undisclosed opinions warrants a new trial.

BVCI objects to Hadley's testimony with respect to four categories of opinions: BVCI's attribution to Boldt of costs associated with BVCI's settlement with the Project's wind-turbine vendor; the impacts of incidents of property damage occurring after BVCI took over Boldt's work; Miltonberger's failure to exclude certain labor and equipment costs; and BVCI's failure to segregate costs associated with descoped work. As for Hadley's opinions on descoped work, those opinions were unquestionably disclosed in her report and thus the admission of those opinions does not require a new trial. The other three categories of testimony relate to discrete costs included in BVCI's claim against Boldt. The Court found that Hadley's criticism of those costs generally related to her disclosed opinion about how the unreliability of BVCI's cost codes caused it to overstate its claim against Boldt. It also noted that those opinions were given in response to developments at trial.[7] Nonetheless, the Court recognized that Hadley's report did

_____

[7] BVCI also faults the Court for not sequestering Hadley and allowing her to be in the courtroom throughout the trial. The Court finds no error, as Federal Rule of Evidence 615(a) expressly states that exclusion is not required when a witness's presence is essential to presenting a party's claim or defense and experts like Hadley, "who are responding to the theories of an adversary's expert[,] are infrequently

not cover the specific costs on which she sought to opine and therefore Hadley was barred from assigning a dollar value to the amount by which those costs were overstated. Thus, the Court permitted Hadley to discuss those categories of costs so long as she kept her opinions within the scope of her criticisms of BVCI's cost-coding methodology.

The Court finds no error in its admission of any of Hadley's opinions because it properly limited her testimony to what had already been disclosed in her expert report. But, insofar as Hadley strayed outside the scope of her previously disclosed opinions, such error was harmless as Hadley's contested opinions related to specific aspects of BVCI's claim. Any issue the jury may have had with the discrete costs discussed by Hadley would not, standing alone, explain the jury's verdict that BVCI's evidence was altogether insufficient to allow it to calculate BVCI's damages.

### 4. Closing Arguments

Finally, BVCI claims that it was prejudiced by multiple statements made in Boldt's closing arguments. Yet BVCI did not contemporaneously object to any of the statements made in closing that it now claims were improper. *See, e.g.*, *Magnuson*, 2024 WL 1216338, at *12 ("[T]he failure of Plaintiff's counsel to object to this comment during trial resulted in waiver of the issue."). Although BVCI contends that its issues with Boldt's closing argument pertain to the evidence discussed above that was admitted over its objection, the Court has now concluded that admission of that evidence was, at most, harmless error. And the Seventh Circuit has "repeatedly explained [that] improper comments during closing argument rarely rise to the level of reversible error." *Willis*, 687 F.3d at 834. Nothing in Boldt's closing arguments warrants a new trial.

---

sequestered." *Ty Inc. v. Softbelly's Inc.*, No. 00 C 5230, 2006 WL 5111124, at *18 (N.D. Ill. Apr. 7, 2006).

### C. Conflict

BVCI also seeks a new trial based on its claim that one of Boldt's counsel had a conflict of interest that he failed to disclose until after the trial. Briefly put, the alleged conflict arose after a company for which Boldt's counsel served as director and shareholder purchased the company that employed BVCI's expert Miltonberger. That acquisition occurred in 2023, two years after BVCI's counsel appeared in this action. According to Boldt's counsel, he did not learn of the issue until after Miltonberger had been deposed in this case, and he notified both the acquiring company and Boldt, and neither had a problem with the situation. Further, the acquiring company agreed that no information about the deal or the acquired company would be shared with Boldt's counsel. BVCI nonetheless contends that it was prejudiced because had it known of the issue it would have handled Miltonberger's questioning differently. But the only real change it notes is that BVCI would have used the fact that Boldt's counsel had an interest in a company that acquired Miltonberger's employer as a means of bolstering Miltonberger's credibility. The Court has no reason to believe that earlier disclosure of the potential conflict would have been so impactful as to change the outcome of the trial.

### D. BVCI Is Not Entitled to a New Trial

In sum, the evidence supported the jury's award of nominal damages. Given its flawed evidence of damages, BVCI set out to achieve a daunting task of convincing this Court that the record reveals a miscarriage of justice requiring a new trial. BVCI has failed in that task. The Court concludes that BVCI has failed to identify any error committed by this Court at trial and, to the extent any error was made, it was not so substantial as to warrant overturning the jury's verdict. Consequently, the Court denies BVCI's motion for a new trial.

## II.    Boldt's Motion to Alter or Amend Judgment

While Boldt does not challenge any aspect of the trial, it has filed a post-trial motion

pursuant to Rule 59(e) seeking to recover the monetary amounts it believes it is due for the work

it performed prior to its termination. To date, BVCI has retained that money on the belief that it

would receive an award of damages at trial in excess of the amount it owed to Boldt for its pre-

termination work. However, Boldt argues that, with BVCI's damages now set at $1.00, the

judgment in this case should be amended to reflect the amounts that BVCI owes to Boldt.

The Court denies Boldt's motion because Boldt seeks relief properly pursued in a new

case, which Boldt has since filed. To begin, BVCI contests both Boldt's entitlement to

compensation for its pre-termination work as well as the amount owed. If the matter proves as

contentious as every other aspect of this dispute, allowing Boldt to proceed in this case will

unnecessarily prolong it. In any case, the relief Boldt seeks arises from a separate and distinct

breach of the Subcontract from that alleged in this case. Boldt seeks costs arising from a

Subcontract provision specifically associated with a termination for cause, and Boldt's pleadings

never even entertained the possibility that Boldt was properly terminated for cause. Moreover,

the applicable Subcontract provision, Section 00552.23.4, provides in relevant part:

> Any amount owed by [BVCI] to [Boldt] for the level of completion of the Work
> shall be retained by [BVCI] until after completion of the Work and applied by
> [BVCI] to pay any amounts and damages owed by [Boldt]. Any excess of the
> amount retained over the amount due under this Article . . . shall be remitted to
> [Boldt] within sixty (60) days after the Work is completed.

(Boldt's Mot. to Am. J., Ex. 1, Subcontract § 00552.23.4, Dkt. No. 325-1.) Because there was no

excess amount retained by BVCI over the amount due to Boldt until the jury decided BVCI's

damages, Boldt's alleged entitlement to compensation did not arise until after entry of judgment.

And the alleged breach of the Subcontract only occurred when BVCI failed to remit that sum

within 60 days. Thus, that new breach of the Subcontract is grounds for a separate action and Boldt must pursue its relief in that case.

## CONCLUSION

For the foregoing reasons, BVCI's motion for a new trial (Dkt. No. 326) and Boldt's motion to alter or amend judgment (Dkt. No. 325) are both denied.

ENTERED:

Dated:  May 12, 2025

Andrea R. Wood
United States District Judge